### THE CASTLETON.

**UNITED STATES GYPSUM CO. v. Mc-WILLIAMS et al.**

No. 11966.

District Court, E. D. New York.

June 8, 1932.

Horace M. Gray, of New York City, for libelant.

Purdy & Purdy, of New York City, for respondent McWilliams.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for respondent United States Gypsum Transp. Co.

BYERS, District Judge.

In this cause the libelant, as cargo own-er, seeks to recover for the total loss of 390 tons of plaster laden on the covered barge Castleton, which overturned at the bulkhead of the libelant situated at 135th street and the East River, on November 7, 1928.

The barge was under charter to the respondent-impleaded (a subsidiary, roughly speaking, of the libelant) under the usual harbor charter by which the owner provided and paid the wages of the bargee.

The cargo was taken at libelant's plant at New Brighton, S. I., on November 5, 1928, and a document in the nature of a receipt was issued therefor; delivery was to be made at libelant's plant in the Bronx, at 135th street and the East River. The barge was taken in tow by a tug, and arrived at destination about 1:30 a. m. on the follow-ing day, which was a Sunday.

The Castleton was made fast at the bulk-head, where she had berthed on fifteen prior trips of the same nature, during the four months next preceding. The tide was low at the time, so that the barge could not come alongside.

Two breast lines and two spring lines were put out, with the aid of a hand from the tug, who landed on the bulkhead, and made the lines fast by putting the eye of each on bitts on the bulkhead. The star-board side was inshore, and the spring lines were made fast on the inshore corners, fore and aft, with a lead of from 45 to 50 feet; the breast lines were made fast to the out-board corners fore and aft. The tide was rising, and the lines were taken in as need-ed, to draw the barge into a snug berth. And, as the tide fell, lines were slackened away, to admit of the barge's falling away from the bulkhead into an offshore position, in which she grounded and took a slight off-shore list.

This was all in accord with previous ex-perience during the duration of this service, all of which involved the same bargee.

The recital as to the lines having been handled, at the arrival, by a deckhand from the tug, and the inability of the barge to make fast close aboard, is based on conflict-ing testimony, but is not thought to be im-portant enough to justify discussion. The fact is, that, during the early morning of November 6th and until about nine or ten o'clock that night, the bargee tended his lines on the ebb and flow of the tide, without in-cident. There is a 6-foot drop in the tide at this place, and the requirement for care in handling the lines is obvious, and was known to this bargee by reason of his prior experience.

November 6, 1928, was Election Day, and, at about six o'clock in the evening of that day, the bargee's wife and two children went ashore.

High water occurred at Port Morris, where the Castleton lay, at approximately 5:55 p. m., which explains the going ashore of the bargee's family at that hour.

The next low water was at approximate-ly 2:55 a. m. on November 7th, and the tide fell 1.7 feet below mean low water.

At around 10:30 p. m. on the 6th, the bargee went ashore to buy some food, and glean what he might from election returns. The tide had been falling for about four hours, and he had accordingly adjusted his lines, at about 9:30 p. m. He was able to go ashore by using a 9-foot ladder, which he hauled up after him. Such is his testimony, and it is not contradicted in the record, al-though no subsequent reference is made to the ladder, which ought to have been found on the string-piece on the following morn-ing.

At the time of leaving, the bargee says his lines were hanging in the water. He remained ashore for an hour or more, and says he then went back to the Castleton, and found she had slid off a little with the falling tide, and was away from the bulkhead "around five feet" (later he made it six). He says his ladder was too short to enable him to board the barge, and, after unsuccessfully trying to pull the barge in near enough to accomplish that purpose, he waited around a little while, and then went to his home to get some sleep.

Returning to the Castleton early the following morning (he says about 6 o'clock, others make it nearer 8) he found that the barge had capsized, and all but her stern breast line had parted. She lay diagonally offshore, with her bow from 20 to 30 feet from the bulkhead.

The cargo was lost, and there was no salvage.

On the 8th, the barge was righted, pumped dry, and towed to dry dock, where only minor repairs were found to be needed.

The testimony establishes quite clearly that the barge was seaworthy, and no contention in the briefs for libelant and impleaded respondent is made to the contrary.

The libel is against the barge and her owner, and the latter has impleaded United States Gypsum Transportation Co., on the theory that, as the barge was under charter to that company, it must answer for the damage sustained. The fact, that the Transportation Company may be regarded as a subsidiary of the libelant, was made much of at the trial, and is discussed in claimant's brief, but seems not to closely affect the issues in the case.

Reference should be made to the fact that three other such vessels as the Castleton had been discharging these cargoes from libelant's mill, two for at least a year before this happening, and there can be no doubt that many bags of plaster had been carelessly permitted to fall into the water off this berth. From this it is sought to be argued that the berth had become unsafe through the presence of these bags of plaster, because they constituted a ridge of hard substance upon which this barge rested in part; and it is argued that, at low water, the Castleton settled upon this ridge, and was thus caused to cant outboard and so capsize and lose her cargo.

This is thought not to have been demonstrated, because the testimony is that the plaster did not harden under water. If a bag were to become wet in the air, the plaster would harden, and then, if cast into the berth, it would so remain for a certain time, before disintegrating. But the testimony would not sustain a finding that hardened plaster in sufficient quantity was shown to have been present in this berth, to cause the capsizing in question. The river bottom was soft black mud.

The Castleton, with this particular cargo, arrived at low water, remained as the tide rose to high water at about 6 o'clock on the morning of the 6th, and safely weathered low water at 2:55 p. m. on that day, for the reason, apparently, that her lines were tended at that time.

She failed to safely survive the low water at 2:55 a. m. of November 7th, because her lines were not tended, and had not been since 9:30 o'clock the night before, and the explanation of this disaster cannot be found in any other circumstance revealed by this record.

Under the facts as so resolved, the applicable principles of law are neither obscure nor indefinite.

The bargee was the agent of the owner with respect to tending the lines; see Dailey v. Carroll (C. C. A.) 248 F. 466.

The many citations of this case need not be recited, for in none is the rule of decision sought to be limited.

The nature of the bargee's responsibility and the scope of his duties to his employer would not have been affected if the charterer, the transportation company, had paid him for overtime, i. e., towing at night, which it did not do in this case; see The Cary Brick Co. No. 8 (D. C.) 34 F.(2d) 981.

Therefore, as between the charterer and the owner, it was the neglect of the latter in failing to tend the lines after the high tide of the night of November 6, 1928, and through the ensuing low tide of the following morning, that caused the loss.

The charterer here was not a common carrier, but was a bailee to transport for hire. The C. R. Sheffer (C. C. A.) 249 F. 600. This relation imposed upon the libelant the burden of proving some act of negligence on the part of the bailee, in order that recovery may be had. It is considered that such negligence has been proved in the failure of the bargee to tend the lines, as has been shown.

The case is thus to be distinguished from The William I. McIlroy (D. C.) 37 F.(2d) 909.

The bailee has shown that the negligence was that of the owner.

As there was no contract for the carriage of this cargo, between the libelant and the owner of the barge, it is not seen how the latter can be held in personam.

It is concluded, therefore, that the libel must be sustained against the barge, and dismissed against McWilliams, without costs. The petition against the transportation company is dismissed without costs.

Settle the usual interlocutory decree on three days' notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals of ownership and incorporation.