**THE STEEL INVENTOR.**

**RALLI BROS., Limited, et al. v. ISTHMIAN S. S. CO. et al.**

**Nos. 2405, 2444.**

District Court, D. Maryland.

Dec. 2, 1940.

988

John H. Skeen and Emory, Beeuwkes, Skeen & Oppenheimer, all of Baltimore, Md., for libelants.

William A. Grimes and Ritchie, Janney, Ober & Williams, all of Baltimore, Md., for respondents.

Geo. W. P. Whip and Lord & Whip, all of Baltimore, Md., for Norfolk, Baltimore & Carolina Line.

Henry L. Wortche, of Baltimore, Md., for Chesapeake Lighterage Co.

L. Vernon Miller, G. Van Velsor Wolf, and Marbury, Gosnell & Williams, all of Baltimore, Md., for Baltimore Towage & Lighterage Co.

CHESNUT, District Judge.

On March 22, 1940, a lighter belonging to the Baltimore Towage & Lighterage Company, capsized in the Baltimore Harbor, with a cargo of 168 bales of burlap. 161 bales of this burlap belonged to Ralli Brothers (of New York), Inc., and the remaining 7 bales were the property of Stein Hall & Co. Inc. The lighter was raised and a part of the burlap was salvaged. The damage to Ralli Brothers was $15,363.28, and to Stein Hall & Co., $202.75, based on the current market price for the burlap. To recover these damages the property owners filed this libel against the Isthmian Steamship Co., as owners of the steamship "Steel Inventor", and also against the vessel. Under the 56th Admiralty Rule, 28 U.S.C.A. following section 723, several other parties have been successively impleaded. How and why this burlap came to be on the lighter of the Baltimore Towage & Lighterage Co. (hereinafter called the Baltimore Company) at the time the lighter capsized, and why the other parties have been impleaded, requires a short narration of the facts.

The story begins at Calcutta, India, where, on or about January 17, 1940, 197 bales of burlap were loaded on the Steel Inventor, and bills of lading issued therefor. They were all consigned for delivery at Norfolk, Virginia. The steamer proceeded without incident, so far as this case is concerned, from Calcutta around the Cape of Good Hope and into the Chesapeake Bay to the port of Baltimore without calling at Norfolk, Virginia, as the great bulk of her cargo was destined for Baltimore. It was necessary to re-ship the burlap back to Norfolk, Virginia, and there-

fore the Baltimore agents of the steamship made an oral agreement with another steamship line, the Norfolk, Baltimore and Carolina Line (hereinafter called the Norfolk Line) to transport the burlap from Baltimore to Norfolk, including the necessary lighterage in the Baltimore Harbor. This oral arrangement (to be followed by the issuance of the Norfolk Line's usual bill of lading) was made a day or two before the Steel Inventor arrived at Baltimore. Pursuant thereto and in order to furnish the necessary lighterage, the Norfolk Line in turn made an oral agreement with the Chesapeake Lighterage Co. (hereinafter called the Chesapeake Company) of Baltimore, to transfer the burlap from the Steel Inventor about a mile up the Baltimore Harbor to the pier of the Norfolk Line. The Steel Inventor duly arrived in Baltimore and was made fast to the pier of the Cottman Co., on the north side of the Baltimore Harbor in the district known as Canton, and was ready to unload the burlap and other cargo on March 22, 1940. The Chesapeake Co., being notified of the time when the lighter was required, and having no immediately available lighter of its own, then made an oral agreement, pursuant to an existing general arrangement, with the Baltimore Company that the latter should furnish the lighter required, but with necessary towage by the Chesapeake Company. The Baltimore Company designated for this service its lighter B–18, and pursuant to the arrangement the Chesapeake Company picked up the lighter where it was then located in the Baltimore Harbor, and towed it to the steamship Steel Inventor early in the morning of March 22, 1940, which happened to be Good Friday. Two other lighters, one the B–21, belonging to and operated by the Baltimore Company, and another, the C–425, belonging to and operated by the Chesapeake Company, were also at the same time alongside the Steel Inventor. The weather during March 22, 1940, was cold and clear but there was a stiff northwest breeze blowing all day with an intermittent velocity ranging from 20 to 30 miles an hour with somewhat higher velocity for short periods. In consequence the water was rough; but during the day the B–21 and the C–425 were both successfully loaded with their respective cargoes on the windward side of the pier. When they had finished their loading they were transferred from the windward to the leeward side of the pier for better security.

In the meantime the B–18, which is the lighter that capsized, was placed at No. 3 hatch of the Steel Inventor and began its loading at about 4 P. M. The stevedores were busily engaged in transferring the cargo from the ship to the lighter without apparent incident until about 7:30 P. M. one of the stevedores noticed that the lighter was badly listing toward the ship and called attention of the ship's "checker" to this condition, and immediately the checker and the stevedores on board the lighter, and the lighterman in charge of the lighter, all hurriedly scrambled up the ladder on the ship's side. Up to that time 168 bales of burlap had been loaded on the lighter. There is no contention that the loading was improper in any way, the uncontradicted evidence being that the load was evenly and properly distributed over the deck of the lighter. The lighterman then notified the office of the Baltimore Company that the lighter was leaking and in a bad condition, and asked that assistance be sent. A belated effort was then made to obtain pumping assistance from a nearby tug, but before this could be done the lighter capsized, turning over toward the side of the ship, a few inches of the bottom of the lighter still being visible above the water, which at that point is about 35 feet deep. The following day the lighter was raised in slings by a derrick and was towed across the harbor to the yard of the Baltimore Company, and a few days later was placed on the marine railway of the Redman Vane Company, immediately adjoining the yard of the Baltimore Company. While still in the water at the yard of the Baltimore Company and again a few days later while on the marine railway, the lighter was carefully inspected by three marine surveyors representing respective insurance underwriting interests.

The Isthmian Steamship Company impleaded the Norfolk Line; the latter impleaded the Chesapeake Company, and in turn the Chesapeake Company has impleaded the Baltimore Company. The Baltimore Company has also filed a cross-libel against the Chesapeake Company for damages to the lighter; and in a separate proceeding the Baltimore Company has filed a petition for limitation of its liability under the applicable federal statute.

The owners of the damaged burlap have clearly established their claim against the Isthmian Steamship Company, and this is conceded by its counsel. The respective contentions of the other parties are as follows: The Norfolk Line admits its responsibility over to the Isthmian Steamship Company if the lighter was *unseaworthy* when furnished for this service, but denies such responsibility under certain provisions of its usual bill of lading, if it is found that the lighter was seaworthy. In turn the Chesapeake Company admits its liability over to the Norfolk Line if the B–18 was not seaworthy, but denies it if the lighter was seaworthy. The Baltimore Company contends that the lighter was in fact seaworthy, that the Chesapeake Company is responsible to the Baltimore Company for the damage to the lighter, and in any event the Baltimore Company is entitled to limit its liability to the value of the lighter, about $1,500.

It at once becomes apparent that the primary and most important question of fact in the case is whether the B–18 was seaworthy on the morning of March 22, 1940, when she was picked up by the tug of the Chesapeake Company and towed to the ship's side. The lighter was a wooden vessel of a type common in the Baltimore Harbor. It was 80 feet long by 24 feet beam with a 7 foot 6 inch depth of hold from the deck, and with a wooden house over the deck. It had a capacity for carriage of 200 net tons. It was not over loaded in this instance. The housing covered most but not all of the entire deck space. The lighter was blunt at both ends, rather sharply receding from the deck to the bottom, and with sides less sharply receding. It was originally built 20 years or more ago and has been in continuous service but with repairs and renewals from time to time. It was purchased by the Baltimore Company in May 1939, and was then surveyed by Mr. Mitchell, marine surveyor acting for the insurer of the Baltimore Company, who advised extensive repairs inside and outside, and these were made in accordance with his recommendations in November 1939. The lighter was in continuous service thereafter until she capsized, her condition being observed from time to time by Hall, the superintendent of repairs for the Baltimore Company, who said she was in good condition on March 22, 1940.

With respect to whether the lighter was seaworthy, the most important facts are as follows. Although the lighter was properly loaded it capsized and sank before the loading was completed. The immediate cause of the capsizing was that the hold of the lighter filled with water. This was caused by leaks in the wooden hull. There is no contention and no evidence that the water in the hold came from seas breaking over the deck, or otherwise than from the leaks in the hull. Just what caused the leaks is a matter of dispute and some controversy. After the lighter was raised and placed upon the marine railway, three marine surveyors, two representing insurance underwriters for the Isthmian Steamship Company and the Norfolk Line respectively, and the third representing the insurers of the Baltimore Company, surveyed the lighter and found the oakum between two planks on the side of the hull which had been next to the ship, protruding and hanging down for a distance of several feet. These surveyors said this protrusion of the oakum had been caused by a bulging outwards of one of the planks, which they attributed to a combination of the pressure and force of sloshing water in the hold, and air pressure caused by the capsizing of the lighter. All of them also stated that there was a certain amount of decay around the end or butts of the planks and on the sill of the ship, which had a tendency to loosen the side planks which had been fastened by spikes to the upright staunchions or timbers of the ship. On the other hand three witnesses for the Baltimore Company, including its superintendent of repairs for its fleet of 36 lighters, the head carpenter for the Redman Vane Company, owners of the marine railway on which the lighter was subsequently repaired, and an operator of the derrick company which raised the lighter, all stated that the protrusion of the oakum from the seams was not due to a *bulging outwards* of the side plank, but that it had been *staved in* from the outside. The planks of the lighter were three inches thick and the overlapping of the planks, whether the one referred to was bulged out or staved in, was only about one inch of the three inches of their thickness. It is hard to reconcile this contradictory testimony of these witnesses all of whom personally saw and observed the side planking of the lighter on the marine railway. If it were neces-

sary to resolve the conflict in evidence I would feel forced to accept the testimony of the surveyors on this point. They were thoroughly experienced experts and well qualified to determine from personal observations the relatively simple matter as to whether the damaged planking was bulged outwards from the side of the lighter or staved inward. It is also significant that the damaged planking, or the particular portion thereof, was not preserved by Hall the superintendent of repairs of the Baltimore Company, although it appears that he was aware at the time of the definite disagreement between the surveyors and himself with respect to their views as to the condition of the planking; while on the other hand it appears the surveyors did not at the time know that Hall contended the planking had been staved in rather than bulged out. Still again the surveyors had no authority to retain or preserve the planking while Hall did have it. Further emphasis is given Hall's failure to preserve the planking in that in his testimony he stated most positively that the planking itself bore evidence of being staved in in that it had a very pronounced gouge in the wood extending in length about six inches and in width about four inches, and that there was a corresponding gouge in the top planking or guard rail of the lighter immediately above this gouge in the side planking below; and he also said that the inner side of the plank showed a definite crack in the wood from the alleged blow to the outside. If the planking had been preserved as evidence and bore the marks attributed to it by Hall, it would have been strong confirmatory evidence, but he threw it away, and explained that he had not appreciated the importance of preserving it.

It is, however, not necessary to a decision of the case to resolve this conflict in the testimony as to the condition of the particular planking because it still remains uncertain from the testimony whether the condition of the planking, whether bulged out or staved in, was the *cause* or only the *effect* of the capsizing of the lighter. Certain it is that the capsizing was caused by leaks in the hull, but whether or not there was only one leak which caused the filling of the hold with water, is uncertain on the testimony. Mr. Mitchell thought that probably the leak which was the effective cause of the capsizing was due to a loosening of the side and end planks or strakes of the lighter where they come together at the end or "rake" of the lighter at one corner on the side next to the ship. He attributed this to probable injuries to the corner guards or "sandboards", by contact or chafing with piers or ships, and also to some extent to a partially decayed condition of the inner framework of the lighter at that place. When the lighter was on the marine railway and the carpenter for Redman Vane Company had removed some of the side planks, the two surveyors other than Mr. Mitchell, again inspected the lighter and then found decay in various portions of the inner framework which had not been observed until after the planks had been removed.

The capsizing of the lighter before it was completely loaded, and so soon after it had been picked up by the tug of the Chesapeake Company, naturally raises an inference of fact that it was unseaworthy on March 22, 1940, unless the evidence shows some definite accident or injury which caused the lighter to capsize. Commercial Molasses Corp. v. New York Tank Barge Corp., 2 Cir., 114 F.2d 248; Insurance Co. of North America v. North German Lloyd, D.C.Md., 106 F. 973, affirmed, 4 Cir., 110 F. 420; The Calvert, D.C.Md., 37 F.2d 355; Id., 4 Cir., 51 F.2d 494; Munroe Co., Ltd., v. Chesapeake L. & T. Co., Inc., D.C.Md., 283 F. 526; Forbes v. Merchants' Exp. & Transp. Co. 111 F. 796, 800; S. C. Loveland Co., Inc., v. Bethlehem Steel Co. (The George W. Bowen), 3 Cir., 33 F.2d 655. In addition there is the positive testimony of the marine surveyors as to the condition of the lighter with respect to leaks in the hull.

The Baltimore Company advances a number of circumstances to support its contention that there was an intervening cause for the capsizing of the lighter. First, attention is called to what has already been stated, that the lighter was extensively repaired in November 1939, and had been in continuous successful use thereafter; but, as has been pointed out, with casual rather than definite periodic and thorough inspections. Again it is contended that the weather conditions on March 22, 1940, were extremely severe and made the loading of the lighter a dangerous proceeding. It is true that the wind was rather high during portions of the day and the water was rough, but I

do not find that these weather conditions were sufficiently severe to have caused damage to the lighter if she had been "tight, staunch and strong" as she was required to be if seaworthy. It is significant that two other lighters of the same class were successfully loaded at the same pier from the same ship on the same day when the weather conditions were certainly no better and probably somewhat worse. There was somewhat contradictory testimony from the witnesses as to the severity of the wind and water at the particular place during the day. They were undoubtedly sufficient to make it prudent and desirable to remove the two lighters which were successfully loaded from the windward to the leeward side of the pier where they were to remain over night. There is also testimony from the two lightermen of the Baltimore Company in charge of its two lighters on this occasion to the effect that the weather conditions were very severe. Collins, in charge of B–21, testified that he telephoned Glenn at the office of the Baltimore Company to the effect that it was really unsafe to load the B–18; and Jaski, the lighterman on the B–18, testified that he telephoned Richardson who was in charge of the work of the lightermen for the Baltimore Company, that the weather was very rough. But both Glenn and Richardson definitely stated that neither Collins nor Jaski told them that the weather was. too bad for loading; and Richardson was very definite in his recollection that Jaski told him about 4:30 P. M., the lighter was all right and the loading would continue until about 8 o'clock. I accept the testimony of Glenn and Richardson in this respect because I am satisfied from all the testimony that if they had been advised by the lightermen that the conditions were too severe for safe loading of the B–18, they would have ordered it to be stopped and the lighter transferred to the leeward side of the pier over night. There was also no evidence that other lighters in the Baltimore Harbor abandoned their customary work and activity on that day.

■ Still another contention is advanced by Hall, the superintendent of repairs for the Baltimore Company. He said that in his opinion the staving in of the side plank of the lighter as previously explained, was the cause of the leak and that that must have been due, in his opinion, to a collision with some floating object between the lighter and the ship. There was, however, no evidence of any particular injury or damage of this nature. If a blow to the lighter had been received of sufficient force to cause the effect described by Hall, it is surprising that no one on the lighter was aware of it at the time. Hall's contention in this respect is, therefore, merely a theory unsupported by any evidence. I find no satisfactory basis for a finding of any particular occurrence or damage to the lighter between the morning of March 22, 1940, and the time it capsized about twelve hours later. I am therefore forced to conclude that the lighter was unseaworthy on the morning of March 22, 1940. The most probable explanation of the leaks in the hold is that the lighter was a very old one and the surging of the lighter due to the wind and water caused strains and stresses which opened the seams in her planks.

■ There is another phase of the testimony that it is important to note. The lighterman in charge of the B–18 was, I think, from the evidence clearly negligent in not discovering the increasing water in the hold. It is a remarkable fact that the lighterman did not discover the precarious condition of the lighter until a comparatively short time before the actual capsizing, when the hold must have been practically filled with water at the time. It was a part of the agreement between the Chesapeake and the Baltimore Companies that the latter should furnish the lighterman with the lighter, and he was employed by the Baltimore Company, assigned by Richardson, its "boss" of lightermen, to take charge of the scow, and it was his duty to report by telephone to Richardson from time to time any conditions affecting the scow which required attention. He was there to protect the scow for the Baltimore Company by whom he was paid and to whom he was alone answerable. Among the duties of the lighterman, as expressly shown by the testimony in this case, are attention to the lines running from the ship to the scow, attention from time to time to the amount of water in the hold of the scow, and also to supervise the proper loading of the scow. In this case the lighterman testified that from time to time he did inspect the hold to ascertain the amount of water therein, and to see if it was increasing, but he utterly failed to notice any increase in the amount. He asserted

that his failure in this respect was due to the motion of the scow; but I find the explanation inadequate. If he did make the investigation, he was, I think, clearly negligent in not discovering the great increase of the amount of water in the hold long before the lighter was in practically a capsizing condition. When the sinking condition of the lighter was finally discovered, the discovery was made by one of the stevedores, and not by the lighterman. The scope of authority of a lighterman is usually quite limited (De Wald v. Baltimore & O. R. Co., 4 Cir., 71 F.2d 810; The B.B.No. 21, 2 Cir., 54 F.2d 532, 534), but here the subject matter in which the lighterman was negligent was clearly within his usual duties, and his employer, the owner of the scow, became responsible for the consequences of his neglect. Dailey v. Carroll, 2 Cir., 248 F. 466.

Although there are five separate parties in this case, all with different interests, the chief antagonists are the Chesapeake and the Baltimore Companies. The main controversy between them arises from their respective views as to the nature and legal effect of the oral agreement between them under which the lighter B–18 was furnished for the carriage of the particular cargo. The contention of the Chesapeake Company is that the agreement made the relation of the lighter of the Baltimore Company to the cargo a *contract of affreightment,* while the Baltimore Company contends that the arrangement constituted only a *"demise"* charter of the lighter. To determine this issue it is necessary to state the arrangement with exactness. It was verbal and informal. All that transpired at the immediate time was that the representative of the Chesapeake Company notified by telephone Mr. Glenn, in charge of placing the lighters of the Baltimore Company, that the Chesapeake Company had a "couple of small jobs" at the Steel Inventor on March 22nd, and had no available lighter for the work and therefore requested the Baltimore Company to furnish a lighter. Glenn replied that they had an available lighter, the B–18, which was then in the Baltimore Harbor at a designated place. Pursuant to this brief and informal conversation the tug of the Chesapeake Company picked up the lighter the next morning and placed it alongside the Steel Inventor on March 22nd. The brief telephone conversation must be interpreted in the light of the background of the prior agreement and custom of the two Companies with respect to the subject matter. There are several lighterage companies operating tugs and lighters in the Baltimore Harbor. Some years ago several of these lighterage companies, including the Chesapeake and Baltimore Companies, agreed upon rates and conditions of service for the lighterage of goods and prepared a tariff schedule of rates and conditions for the service, copies of which were sent to their customers. The rate of carriage for general merchandise was 60 cents per ton of 2,000 pounds, with extra charge for service on Sundays and holidays and daily use other than from 7 A. M., to 5 P. M. If the lighter was hired by the day the rate was $17 per day, including Sundays and holidays, with an extra charge of $3 per night for a watchman when cargo is aboard, and with no insurance on cargoes hired on this basis, and with extra charge for towage for such day hire. Other specified conditions in the tariff sheet included the provision that when lighters are engaged by the day no receipt was given by the lighterage company, and when employed on the tonnage basis receipts were given when cargoes were placed on the lighter in such manner that count could be made and exceptions noted, and there was the further provision that when employed on the tonnage basis cargoes would be protected against marine loss to the extent of $8,000 per lighter provided there was no specific insurance. There was also a further general understanding and agreement between some of the lighterage companies, including the Chesapeake and Baltimore Companies, that when any one of them had an order for lighterage but no available lighter, the particular work could be sublet to another company which did have an available lighter on the basis of compensation at the rate of 50 cents per ton instead of 60 cents per ton; that is to say, the company receiving the order would transfer it to the other company but the first company would bill the customer at 60 cents and in turn be billed by the other company at the rate of 50 cents per ton. Ordinarily on such occasions the company furnishing the lighter would also furnish the tug; but, as the Baltimore Lighterage Company had no tugs but only lighters, there was the further custom between the Chesapeake and Baltimore Companies that on such sublet orders the Chesapeake Com-

pany should also furnish its tug if available and be paid by the Baltimore Company at the usual towage rates. It is to be noted that in the present instance the Baltimore Company furnished its lighter on the tonnage basis and not on the basis of day hire. It was also an important feature of the customary arrangement that the Company furnishing the lighter furnish with it a lighterman, whose duties have been above described, who was paid by and responsible to the company owning the lighter. When the lighter was loaded the tug was notified, and in cases like the instant one the Chesapeake Company tug would pick up the loaded lighter and tow it to its destination; and when the cargo was unloaded the Chesapeake Company would notify the Baltimore Company and ask instructions as to whether to leave the lighter there or tow it elsewhere. It is also importantly to be noted that the Chesapeake Company did not furnish any agent or representative to stay with the lighter while loading; and the lighterman of the Baltimore Company was expected to keep his superior officer advised by telephone from time to time with respect to the work of loading the lighter or conditions arising that might affect it.

■ Under these customary conditions, it is the contention of the Baltimore Company that the charter of the B–18 resulted in a demise charter and not a contract of affreightment. The distinction between the two lies in the point of management. If the vessel is furnished with a crew paid by and under the control of the owner, the nature of the charter is ordinarily not a demise charter, which results when the vessel is hired or rented out for a specified period or voyage without a crew, or with a crew paid by and responsible to the charterer. In accordance with this distinction a demise charter is often called a "bare boat" charter; although it is said that "the distinction is not always in whose employ the crew may be, for the demised ship may be hired with a complete staff of servants and employees aboard". Robinson on Admiralty, p. 594; Reed v. United States, 11 Wall. 591, 600, 20 L.Ed. 220; United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403; Federal Forwarding Co. v. Lanasa, 4 Cir., 32 F.2d 154. The crucial test would seem to be, where is the possession and control; if in the charterer then it is a demise charter; but

otherwise if the possession, control and management lies with the owner.

It is not easy to apply this distinction with certainty to the particular arrangement in the instant case because there was no definite expressed agreement between the parties with respect to the management and control of the lighter while she was loading at the Steel Inventor. When the Chesapeake Company towed the lighter to the Steel Inventor it doubtless could be said to have its management and control, as it would also have had when towing the lighter when loaded to point of destination. But it is also consistent with the particular arrangement that this control was not as charterer of the lighter but by virtue of the towing contract only. And as has been said, it is importantly to be noted that the arrangement between the two Companies did not contemplate that the Chesapeake Company should have any one in charge of the lighter during loading, but that on the contrary such management and control of the lighter as there was resided in the lighterman, and it is clear that he was expected to report to his superior officer in the Baltimore Company. These particular conditions smack more of a contract of affreightment than a demise charter; although in some cases a somewhat but not exactly similar dealing with lighters in harbor work has been treated as a demise charter. See The Daniel Burns, D.C., 52 F. 159; Id., 2 Cir., 56 F. 605; Monk v. Cornell Steamboat Co., 2 Cir., 198 F. 472; The Willie, 2 Cir., 231 F. 865. And it has been said that in doubtful cases the courts lean to holding against a demise charter. Pacific Imp. Co. v. Schubach-Hamilton S.S. Co., D.C.Wash., 214 F. 854; Reed v. United States, supra.

■ It is, however, not necessary to determine in this case whether there was a demise charter of the lighter; because, whether it was or not, the Baltimore Company was impliedly obliged to furnish a seaworthy vessel, and in this case I have concluded as a matter of fact that the lighter was not in a seaworthy condition when picked up by the tug on the morning of March 22nd. Cullen Fuel Co. v. Hedger, 290 U.S. 82, 87, 54 S.Ct. 10, 78 L.Ed. 189; and The Irving, D.C., 16 F. Supp. 22, affirmed, Conners Marine Co. v. Manhattan Lighterage Co., 2 Cir., 91 F.2d 1011, are cases quite similar on the facts. The distinction between a demise

charter and a contract of affreightment would have been of material importance if the condition of unseaworthiness had developed only after the tug had picked up the lighter and before the capsizing. It is conceded that if the relation was not that of a demise charter but a contract of affreightment, seaworthiness of the lighter was required up to the time she would have started her voyage from the ship, that is, as it is expressed in maritime law, "broken ground" on the voyage. As the ship was unseaworthy when first delivered to the Chesapeake Company the Baltimore Company is clearly liable to the Chesapeake Company for the damages sustained by it under its contract with the Norfolk Line to furnish proper lighterage. See Cullen Fuel Co. v. Hedger, supra, and in the Second Circuit, In re Cullen Fuel Co., 62 F.2d 68.

The Harter Act, 46 U.S.C.A. § 190 et seq., is not relied upon by the Baltimore Company; nor indeed by any other party to the case. The lighter was a private and not a common carrier; and had not broken ground after being loaded; and there was no exemption from liability set up in the oral agreement. See Robinson on Admiralty, pp. 496, 506; The C. R. Sheffer, 2 Cir., 249 F. 600; The Westmoreland, 2 Cir., 86 F.2d 96; The Fort Gaines, D.C.Md., 24 F.2d 849, affirmed, Federal Forwarding Co. v. Lanasa, 4 Cir., 32 F.2d 154; Southern Pac. S.S. Co. v. New Orleans Coal & Bisso Towboat Co., D.C., 43 F.2d 177; The Fred E. Hasler, 2 Cir., 55 F.2d 919; Ralli v. New York & T. S.S. Co., 2 Cir., 154 F. 286. Even if the relationship had been that of a demise charter, and the lighter had been seaworthy when first picked up by the Chesapeake Company's tug, nevertheless I should have to find the Baltimore Company liable by reason of the negligence of the lighterman, as agent of the Baltimore Company, in the management of the scow. If he had promptly discovered the increase of water in the hold, as he should have done in the exercise of due diligence, aid could have been secured from nearby or otherwise available tugs to pump out the water and prevent the capsizing of the lighter. A belated effort to do this was made and a tug was secured but unfortunately it was done entirely too late and after the hold was filled with water. Nor did the lighterman make any effort even to use hand pumps on the lighter until the casualty was imminent.

As the lighter was unseaworthy, and the loss was due to the negligence of its owner, and no negligence of the Chesapeake Company as charterer is shown, the ultimate loss must fall upon the Baltimore Company, and therefore its cross-libel for damages must be dismissed. The Castleton, D.C., 60 F.2d 132. And as the Baltimore Company as owner made a so-called "personal contract" for the use of the lighter, in which it impliedly warranted it to be seaworthy, when it was not, it is not entitled to limit its liability under the applicable federal statute, as amended in 1936, 46 U.S.C.A. § 183. Cullen Fuel Co. v. Hedger, supra; The Fred Smartley, Jr., 4 Cir., 108 F.2d 603, 606; Hockley v. Eastern Transp. Co., D.C.Md., 10 F.Supp. 908, 914. Possibly the owner of the lighter might have been able to limit its liability in a direct tort suit by the cargo owner against it (Flat-Top Fuel Co. v. Martin, 2 Cir., 85 F.2d 39, 42), but not against the claim for indemnity by the Chesapeake Company, with which the owner made a personal contract.

The Baltimore Company also claims the benefit of the shipper's insurance as a credit against the amount of its liability for the damage. This question was somewhat indefinitely referred to at the trial and oral argument, but is now for the first time definitely advanced in a supplemental brief filed by counsel for the Baltimore Company. The point is now made in the following way. It will be remembered that the Isthmian Steamship Company arranged with the Norfolk Line to carry the burlap to Norfolk. The oral agreement therefor included lighterage, which the Norfolk Line engaged the Chesapeake Company to perform, and it in turn sub-contracted the work to the Baltimore Company. It is assumed that when the burlap was placed on the lighter furnished by the Baltimore Company that constituted a delivery, so far as the Isthmian Company was concerned, to the Norfolk Line. No bill of lading or even informal receipt was given before the lighter capsized, and it appears that it was the custom of the Norfolk Line to issue its usual standard form of bill of lading for the water carriage only upon delivery of the cargo of the lighter to the ship of the Norfolk Line. The Baltimore Company contends it must

be considered that the liability of the Norfolk Line for the loss and damage to the burlap is determined by the provisions of its usual bill of lading, and that as the ultimate liability in this case of the Baltimore Company, under the pleadings, is derivative from the liability of the Norfolk Line, the Baltimore Company is in turn entitled to the benefit of all the provisions of the bill of lading among which section 2(c) reads as follows:

"(c) Any carrier or party liable on account of loss or damage to any of said property shall have the full benefit of any insurance that may have been effected upon or on account of said property, so far as this shall not void the policies or contracts of insurance: Provided, That the carrier reimburse the claimant for the premium paid thereon."

This contention seems to attempt a renewal of what heretofore was a long continued war between the shipper's insurer and the carrier over the benefits of the shipper's insurance. See Phœnix Ins. Co. v. Erie & Western Transp. Co., 117 U.S. 312, 6 S.Ct. 750, 29 L.Ed. 873; Luckenbach v. W. J. McCahan Sugar Ref. Co., 248 U.S. 139, 39 S.Ct. 53, 63 L.Ed. 170, 1 A.L.R. 1522; The Turret Crown, 2 Cir., 297 F. 766; China Fire Ins. Co. v. Davis, 2 Cir., 50 F.2d 389, 76 A.L.R. 1259, certiorari denied, Mellon v. China Fire Ins. Co., 284 U.S. 658, 52 S.Ct. 36, 76 L.Ed. 558; The J. L. Luckenbach, 2 Cir., 65 F.2d 570; Robinson on Admiralty, pp. 543, 544. The last battle in this war was won by the shipper's insurer in the case of China Fire Ins. Co. v. Davis, where the Second Circuit held the above quoted provision of a railroad bill of lading invalid as an unjust discrimination under the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and, although there appears to be no judicial decision upon the point, the same principle is thought by Mr. Robinson to apply (p. 545) under the Shipping Act, 46 U.S.C.A. § 812, which also bars discrimination by common carriers by water, although in somewhat different language. It is therefore very doubtful indeed whether the quoted provision in the Norfolk Line's usual bill of lading is now valid. Even if it were held to be, there is an absence of sufficient factual data in this case for its application. The testimony is meagre and uncertain with respect to the precise conditions, extent and coverage of the insurance policies held by the shipper, although there are quite clear indications in this case that the original libel was intended to be for the benefit of the cargo insurer. The policies were not available to be put in evidence. The point is not made in the answers of the Baltimore Company or the Chesapeake Company, and, although the quoted provision of the Norfolk Line bill of lading is set up in the amended answers of the latter, the point has not been argued or pressed by its counsel; and it is at least doubtful whether the Norfolk Line could rely on its bill of lading at all under the circumstances of this case. No authority to support such a contention has been called to my attention. I am therefore unable to conclude that the Baltimore Company is entitled to the benefit of the shipper's insurance in this case. The situation was quite different in the case of The Ferncliff, D.C., 22 F.Supp. 728, 740, 741, where the insurance collected by the shipper was allowed to be credited on the claim, but there, among other distinctions, the insurers made only a compromise payment, and waived subrogation. The question would not be open if the Carriage of Goods by Sea Act applied, as it does not, to the Norfolk Line, 46 U.S.C.A. § 1303(8), as the Act prohibits the carrier from contracting for the benefit of such insurance.

The only remaining question is the measure of damages to which the libelants as owners of the burlap are entitled. If the liability is to be calculated on the basis of the current market price at the time and place of delivery, the amounts are established by the testimony as $15,363.28 for Ralli Brothers, and $202.75 for Stein Hall & Company, to which interest at 6% should be added from the date of the loss, March 22, 1940. It is, however, contended by the Baltimore Company that, as its ultimate liability is derivative and not direct under the pleadings in the case, the proper measure of liability must be determined from the provisions of the Isthmian bill of lading as affected by the United States Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. §§ 1300–1315. It is contended that, on the latter basis, the loss of Ralli Brothers is only $12,430.56, and that Stein Hall & Company are entitled to a somewhat smaller amount than above mentioned.

The libelants base their claim against the Isthmian Steamship Company on breach of contract, and it will of course

have been noted that they are not directly suing the Baltimore Company in tort for negligence. If the suit had been in the last mentioned form it would seem clear enough that the larger sum would be the proper measure of damages. Counsel for the Isthmian Steamship Company also joins in the contention that the proper measure of damages results in the smaller sum. The contention is based on the construction of two provisions in the bill of lading. At the bottom of this long printed document and below the signatures there appears in print the following:

"Paramount Clause.

Indian Carriage of Goods by Sea Act, 1925

This Bill of Lading is and shall have effect subject to the terms and provisions of the Indian Carriage of Goods by Sea Act, 1925, and of the Rules comprising the Schedule thereto as in the said Schedule set out and/or as applied by the said Act.

"The Carriers will not be accountable at all for Gold, Silver, Bullion, Specie, Jewellery, Precious Stones, Precious Metals, Documents, Works of Art, Watches, Silks or other precious or valuable articles.

"It is mutually agreed that unless a higher value be stated herein, and an increased freight rate specially arranged therefor the value of the merchandise hereby receipted for does not exceed the sum of ten pounds sterling per cubic foot for measurement goods, or ten pounds per hundred weight for weight goods nor the sum of one hundred pounds sterling for any single package and that the freight has been adjusted on such valuation, and no oral declaration or agreement shall be evidence of a different provision or of a waiver of this clause. In the event of any liability being adjudged against the Steamer or Owners, in respect of the merchandise, no value shall be placed on such merchandise higher than as above *not higher*

*than the invoice cost* or such other value as may be expressly stated herein, nor shall the Shipowners be held liable for any profits or consequential or special damages and the Shipowners shall have the option of replacing any lost or damaged goods."[1] (Italics supplied)

It is contended that by the proper construction of the above provisions the sound value of the burlap must be limited to the invoice cost, as there was no other value expressly stated in the bill of lading. The invoice cost was less than the market value at the time and place of delivery.

It is, however, importantly to be noted that in the margin of the bill of lading there was placed by a rubber stamp an apparently superseding clause reading as follows:

"Paramount Clause

"This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States approved April 16, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights and immunities or an increase of any of its responsibilities or liabilities under said Act if any term of this Bill of Lading be repugnant to said Act to any extent such terms shall be void to that extent, but no further."

As there could not well be *two paramount* clauses, and as there is no extrinsic evidence bearing on the intention of the parties, and as the physical appearance of the bill of lading indicates, I reach the conclusion that it was the intention of the parties to supersede the former so-called paramount clause by the United States Act. It is also clear enough as a matter of law that the responsibility of the carrier in this case is to be determined by the provisions of the United States Act, which, in section 1312, provides "This chapter shall apply to all contracts for car-

---

[1] It will be noted that the second and third paragraphs above quoted from the bill of lading are contained in quotation marks. These, with the physical arrangement of the printed matter would indicate that the quotations are from the Indian Act of 1925, and it was so assumed by counsel in argument; but an examination of the text of the Indian Act, obtained only by the diligence of counsel for the Baltimore Company from the Congressional Library, shows that the Act does not contain the quoted clauses; and on the contrary, Article 4(5) of the schedule annexed to the Indian Act, relating to the carrier's limitation of liability, is substantially the same as section 1304(5) of the United States Act, hereinafter referred to. The origin of the paragraphs of the bill of lading enclosed in quotation marks is not known and the significance of the quotation marks is not otherwise explained.

riage of goods by sea to or from ports of the United States in foreign trade." See, also, Robinson on Admiralty, § 77. But the point is made that the printed provisions of the bill of lading should control except to the extent that it is repugnant to the United States Act; and it is urged that the provision above italicized with respect to invoice cost, is a *valuation* clause not inconsistent with the United States Act. In the latter, section 1304(5) provides in the matter of valuation of cargo that (1) the carrier shall not be liable in an amount exceeding $500 per package unless the value is inserted in the bill of lading; (2) that by agreement between the carrier and the shipper a greater maximum, but not a smaller, may be fixed; and (3) in no event shall the carrier be liable for more than the amount of damages actually sustained. The carrier may increase but not decrease the extent of its liability, 46 U.S.C.A. § 1305. These provisions constitute "limitations of liability" rather than a "measure of liability" which is more particularly the function of a true valuation clause. See Shackman v. Cunard White Star, D.C., 31 F.Supp. 948.

It is said by a recent commentator that, despite the provisions of the recent United States Act, it is still permissible for the shipper and carrier to agree that loss claims shall be adjusted on the basis of the invoice value of the merchandise instead of on the market price at port of destination, that is, they may agree upon a true valuation clause as contrasted with a limited liability clause. Knauth on Ocean Bills of Lading, p. 161. But it is said by counsel that there is no judicial decision on this point. Assuming the correctness of the position as stated, I am still unable to reach the conclusion that the provision in the bill of lading relied on is controlling in this case. As I read and construe it, it constituted a "limitation of liability clause" and is not a "true valuation" clause. The distinction between, and the respective legal effects of, the two types of clauses are clearly explained in two recent Supreme Court cases. The Ansaldo San Giorgio I v. Rheinstrom Bros. Co., 294 U.S. 494, 496, 55 S.Ct. 483, 79 L.Ed. 1016, and Smith v. The Ferncliff, 306 U.S. 444, 59 S.Ct. 615, 83 L.Ed. 862 (see, also, same case in the district Court

for Maryland, 22 F.Supp. 728, 742). As both the clause of the bill of lading and the United States Act deal with the same subject matter of limitation and not true valuation clauses, it is not reasonable to suppose that the parties to the bill of lading intended both to be operative even though in some minor respects there was not complete identity in their provisions, and to this extent it might be literally said that some provisions of the bill of lading are not necessarily inconsistent with the United States Act. But however this may be, I take the view that the subordinate provision in the bill of lading which undertakes to limit the maximum liability of the carrier to the invoice cost is substantially repugnant to the provisions of the United States Act, at least as applied to the facts of this case. The latter Act expressly prohibits the carrier from contracting for a limitation of liability in an amount less than $500 per package, which greatly exceeds either the invoice cost or the market price of the packages of burlap involved in this case. If the bill of lading further undertakes to limit the amount of the carrier's liability to the invoice *cost*, it is necessarily repugnant to the United States Act. The effect of the latter leaves the shipper free to recover his actual damages when less than the maximum stated in the Act (as is the factual situation here), at least where the bill of lading does not contain a true valuation clause as distinct from a mere limitation of liability clause. This being so then, as stated in The Ansaldo case, supra, 294 U.S. at page 496, 55 S.Ct. at page 484, 79 L.Ed. 1016: "The measure of the shipper's recovery is normally the market value of the goods at destination, in like condition as they were when shipped, on the date when they should have arrived."

I conclude therefore that the proper measure of damages for Ralli Brothers is $15,363.28, with interest at 6%, and for Stein Hall & Company, $202.75, with like interest. I have filed herewith separate "findings of fact and conclusions of law" which are intended to be in compliance with the admiralty rule upon the subject. If these findings are not sufficiently detailed, counsel can submit others for consideration. A decree in accordance herewith may be submitted after consideration by counsel for the respective parties in interest.