## UNITED STATES v. SHEA.

APPEAL FROM THE COURT OF CLAIMS.

No. 896. Submitted January 8, 1894. — Decided March 5, 1894..

S. agreed with a Deputy Quartermaster-General, who acted on behalf of the United States, to provide and furnish whenever called upon during the coming fiscal year, such vessels as might be required for a specified service in the harbor of New York. Each vessel was to have an engineer and fireman, the remainder of the crew to be supplied by the United States when required, and the fuel to be supplied by them. The payment, if employed by the day, was to be at the rate of $67 *per diem* for each vessel. The government was to have the management and control of the vessels while in its service. Under this contract S. furnished a vessel called the Bowen on the requisition of the quartermaster, which was accepted by the government, and went into its service. While in government employ a collision occurred, whereby the Bowen was so damaged that it had to be laid up for repairs for 61 days. During the most of this time S., at the government's request, furnished another vessel called the Stickney, which was accepted. He hired this vessel, paying $55 a day, and received from the government the contract price of $67 for its use. When the Bowen resumed service after the completion of the repairs, S. claimed compensation for it for the 61 days at the rate paid by him for the Stickney. *Held*, that the contract was one for hiring, and not for service, and that the government, during its possession of the vessel, was a special owner, and bound to pay rent for it until returned to S.

THE facts of this case are stated in the findings of the Court of Claims. The first is that on May 28, 1886, the petitioner entered into a contract with the Deputy Quartermaster-General of the Army for and in behalf of the United States, the important articles of which are as follows :

"ARTICLE 1. That the said Daniel Shea shall provide and furnish to the party of the first part, whenever called upon during the fiscal year ending June thirtieth, eighteen hundred and eighty-seven, such vessels of the descriptions hereinafter given as may be required to take the place of the vessels now performing service for the U. S. Army between New York City and Governor's Island, New York, Governor's Island and Sandy Hook, and New York Harbor generally, respectively,

the steamers Atlantic, Ordnance, and Chester A. Arthur; that the vessels furnished as aforesaid must each have an engineer and fireman, and conform to the following conditions, viz.: The steamer to take the place of the Chester A. Arthur must be of about the size and the character of the Chester A. Arthur, and the steamers to take the places of the Atlantic and Ordnance, respectively, must have the capacity for freight and passengers and be of the size and character of the steamer James Bowen; and that all the vessels furnished must be staunch, in first-class order in every respect, well equipped, and conform fully to the requirements of the law.

" It is further agreed that the fuel required by said vessels so furnished while in service, under this agreement, shall be supplied by the government, and that this contract shall commence on the first day of July, eighteen hundred and eighty-six.

" And it is further agreed that the party of the second part shall furnish, when required, the remainder of the crew, consisting of a captain, a mate, two deck hands, and a fireman.

\*        \*        \*        \*        \*

" ART. 4. That for and in consideration of the faithful performance of the stipulations of this agreement the party of the second part shall be paid, at the office of the disbursing quartermaster U. S. Army, at New York City, as follows: The sum of sixty-seven (67) dollars per day for each vessel employed, including the engineer and the fireman, when employed by the day, and the sum of ten (10) dollars per hour for each vessel employed, including the engineer and the fireman, when employed by the hour; and for the said remainder of the crew, when required, the sum of thirteen dollars per day.

" ART. 5. That in case of failure of the said party of the second part to comply with the stipulations of this contract, according to the true intent and meaning thereof, then the party of the first part shall have the power to hire vessels elsewhere in open market at the sole expense and charge of the party of the second part."

The second and third findings are as follows:

2. "After the making of said contract, and before the expiration of the fiscal year, (June 30, 1887,) upon being called

upon by the quartermaster's department therefor, the claimant provided and furnished a vessel called the James Bowen, then staunch, in first-class order in every respect, well equipped, and conforming fully to the requirements of the law, and with such part of the crew as the claimant was required by the contract to furnish, and the same was accepted and used by the defendants.

3. "On the first day of January, 1887, while in the service and under the exclusive management and control of the quartermaster's department, and having an unlicensed captain or pilot, said vessel was damaged in a collision with a ferry-boat, in consequence of which she was necessarily laid up for repairs until March 2 of the same year, when, on the next day, she resumed work.

"The collision occurred during a fog, and the supervising inspectors, on an investigation, found that it was accidental and was not due to inattention, unskilfulness, or lack of precaution on the part of the pilots. The cost of repairs was paid by the claimant.

"During the time said vessel was undergoing repairs, the claimant, being called upon therefor, furnished another vessel under said contract, for which he paid $55 a day. During said time the engineer and fireman of the claimant were on the vessel watching and superintending the work."

There is no express finding that any sum was ever paid to the petitioner on account of this contract. It appears, however, from the fourth finding, that, on April 1, 1887, the Deputy Quartermaster-General forwarded to the Quartermaster-General a voucher, of which the following is a copy:

*The United States to Daniel Shea, Dr.*

| Place and date. | | Dols. | Cts. |
|---|---|---|---|
| N. Y. City, April 1, 1887... | For hire of the steamer James Bowen, from Jan'y 1st to March 2d, 1887, inclusive, 61 days, at $55 per day... | $3355.00 | |
| | Engineer and fireman, 61 days, at $7.00 | 427.00 | |
| | | $3782.00 | |

which voucher was accompanied with a recommendation that authority be granted to pay the same, and with the following explanation :

" The facts are as stated herein. The James Bowen was under charter to the quartermaster's department, and, as the Quartermaster-General is aware, was, on the 1st of January, 1887, on one of her trips between the Battery and Governor's Island, run into by the Brooklyn ferry-boat Atlantic.

" The James Bowen was at the time under the exclusive control and management of the government, being manned and navigated by employés of the quartermaster's department.

" In the collision the James Bowen was very badly damaged, and while undergoing repairs her owner was compelled to hire a vessel in her stead. The within claim is made for reimbursement of that expense. I regard it as perfectly proper, reasonable, and just, and therefore recommend its payment.                                   HENRY C. HODGES,

" *Deputy Q. M. Gen. U. S. Army, Depot Quartermaster.*"

That on April 6, 1887, the Quartermaster-General called upon the Deputy Quartermaster-General for further particulars, and received in response a letter, copied at length, the latter part of which is as follows:

" The James Bowen was under charter to and employed by the quartermaster's department at the time of the collision under the contract of Daniel Shea, dated May 28, 1886. Immediately after the collision the contractor was called upon to furnish another vessel under this contract. He furnished the steamer E. H. Webster, one of his own boats. That vessel, although a very staunch, good boat, was not entirely satisfactory for the service, and, upon search, the Joseph Stickney was found and put on the duty by the contractor. The E. H. Webster was on duty from January 1 to 4, inclusive, and the Joseph Stickney from January 5 to March 2, 1887. During this time the James Bowen was undergoing repair of the damage done in the collision. As the James Bowen was at the time wholly in charge and under the management and control of the quartermaster's department, I was

under the opinion, and am still, that the department was bound to save the contractor from loss on account of the damage and to pay for her time under the contract until restored to her owner upon completion of the repairs.

"With this in view she was reported on my report of persons and articles for January, at the contract rate, viz., $67 per day, including an engineer and a fireman. Upon further reflection, however, I concluded to allow for the Bowen's time only at the rate which her owner was obliged to pay for the vessel put in her stead. One of these, the E. H. Webster, was his own and was in service, as before stated, from January 1 to 4, and the other, the Joseph Stickney, was hired by him at $55.00 per day, and was in service from January 5 to March 2. So the matter stands thus:

"The E. H. Webster was in service from January 1 to 4, and the Joseph Stickney from January 5 to March 2, and has been paid for. The James Bowen was laid up from January 1 to March 2, inclusive, and her time has not been paid for, but I recommend that her owner be paid at the rate of $55.00 per day for the vessel. I enclose herewith a voucher covering the time, as well as the item for an engineer and a fireman, embraced in Shea's claim in article 1 of this letter. If the Quartermaster-General desires, supplementary reports of persons and articles covering this service will be prepared and forwarded immediately."

On May 17 the Quartermaster-General transmitted the claim and voucher to the Third Auditor of the Treasury for adjudication and settlement.

The fifth finding is that on "November 29, 1887, the Auditor reported against paying the claim, on the alleged ground that the boat was wholly under the control of the owner and his agents and employés, and if the injury had been due to the negligence of any one connected with the management of the James Bowen, and not due to the ferry-boat, (with which the collision occurred,) the United States could not be charged with that negligence. The Second Comptroller on the same day concurred with the Auditor in disallowing the claim, and it has not been paid."

On these facts thus found the Court of Claims decided as a conclusion of law that the plaintiff was entitled to recover the sum of $4087.

*Mr. Assistant Attorney General Dodge* and *Mr. Conway Robinson* for appellants.

The first question is, whether this contract constituted a mere hiring of the use of this vessel to do certain work, or a complete demise sufficient to divest ownership for the time. What is the proper construction of the contract of May 28, 1886? The court below has treated it as though it was a demise of the steamer James Bowen to the United States for the fiscal year ending June 30, 1887, and made the United States her special owner for said year. And such is the contention of the appellee. But this, it is submitted, is not the true or proper construction of that contract.

To have that effect a contract must be such as of itself to transfer the title and ownership of some particular vessel to a party as grantee or lessee for a voyage or for some definite period or time of service mentioned in the contract. It must give the grantee or lessee a right to that particular vessel for and during the time specified as against the grantor or lessor. This court has said: " Unless the ship herself is let to hire, and the owner parts with the possession, and command and navigation of the same, the charterer or freighter is not to be regarded as the owner for the voyage. . . . Courts of justice are not inclined to regard the contract as a demise of the ship if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer." *Reed* v. *United States,* 11 Wall. 591.

The language in which this contract is couched was clearly intended to permit the contractor to furnish any vessels he pleased, and to change them whenever he pleased, so long as they performed the service contracted for and came up to the standard and conformed to the requirements of the contract, and were such as the contract called for. Had it been contemplated that the government should by this contract acquire

any right, title, or ownership in any particular vessel during the fiscal year, or during any part of said year, it would necessarily have been couched in different language.

Could the government have insisted that any particular vessel which had entered upon the contract service should continue to perform the contract service during the rest of the year if the owner did not wish her to do so, and desired to withdraw her, and was ready and willing to furnish another vessel such as the contract called for? It is submitted that the government could not insist upon anything of the kind, and for the obvious reason that it would have no right to or ownership in any particular vessel.

Even where words of demise are used, yet it must appear that the instrument taken as a whole was intended to operate as such or it will not be so construed. "When the party enters into that, which on the face of it appears to be an agreement, though there are words of present demise, yet if you collect on the face of the instrument the intent of the parties to give a future lease, it shall be an agreement only." *Christie* v. *Lewis*, 2 Brod. & Bing. 410, 436; *Morgan* v. *Bissell*, 3 Taunt. 65.

Where, as in the case at bar, the contract contains no words of demise, and especially where its provisions are inconsistent with an intention to give any ownership to the hirer, it will be held to be a mere contract of affreightment or bailment for hire at most. *Saville* v. *Campion*, 2 B. & Ald. 511; *Christie* v. *Lewis*, 2 Brod. & Bing. 410; *Marcardier* v. *Chesapeake Ins. Co.*, 8 Cranch, 39; *Clarkson* v. *Edes*, 4 Cowen, 476; *Leary* v. *United States*, 14 Wall. 607.

The construction of the contract of May 28, 1886, which the appellant contends for, namely, that it is not a demise of the James Bowen and does not make the appellant special owner during the fiscal year ending June 30, 1887, or during the time of service, is borne out by all the other covenants and provisions of the contract.

The vessels are to be employed "by the day" or "by the hour." The contractor, Daniel Shea, covenants and agrees that "all the vessels furnished must be staunch, in first-class

order in every respect, well equipped, etc.," and that he "shall provide and furnish . . . such vessels . . . whenever called upon during the fiscal year ending June 30, 1887." And it is also covenanted and agreed "that in case of failure of the said party of the second part to comply with the stipulations of this contract, according to the true intent and meaning thereof, then the party of the first part (the appellants) shall have the power to hire vessels elsewhere in open market at the sole expense and charge of the party of the second part." The service which the government was to receive was such that it could be secured by hiring other vessels.

Can it be pretended for a moment that the contractor could provide and furnish to the government any vessels of which the government had the special ownership? He would not be providing and furnishing the government a vessel if the government already had that very vessel. He could only do so upon the theory that the government did not have ownership under said contract. The requirement that the contractor should furnish such vessels whenever called upon during the fiscal year is entirely inconsistent with the idea of any ownership in the government.

It cannot be contended for a moment that the entire possession and control of the vessels were surrendered by claimant. At all times his engineer and fireman were at least in partial possession, as evidenced by their management of the repairs.

In conclusion, we submit that, taking this contract of May 28, 1886, as a whole, sounding as it does in contract and covenant merely, containing no words of letting, designating no particular vessel, designating no definite time of service, and with its covenants and provisions inconsistent with the idea of any special ownership in any particular vessel being given to the government, it is clear that it should be construed not to be a demise of the James Bowen, and should be held to be a mere contract of affreightment, or bailment for hire at most.

The appellant did not in said contract undertake any responsibility beyond that which may be implied by the law of bailment.

*Mr. Franklin H. Mackey* and *Mr. John W. Butterfield* for appellee.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

This case turns upon the construction to be given to the contract of May 28, 1886, taken in connection with the action of the parties thereunder. Was this a contract of hiring or for service? In *Reed* v. *United States*, 11 Wall. 591, 600, it was said by Mr. Justice Clifford, speaking for the court:

"Affreightment contracts are of two kinds, and they differ from each other very widely in their nature as well as in their terms and legal effect.

"Charterers or freighters may become the owners for the voyage without any sale or purchase of the ship, as in cases where they hire the ship and have by the terms of the contract, and assume in fact, the exclusive possession, command, and navigation of the vessel for the stipulated voyage. But where the general owner retains the possession, command, and navigation of the ship, and contracts for a specified voyage, as, for example, to carry a cargo from one port to another, the arrangement in contemplation of law is a mere affreightment sounding in contract and not a demise of the vessel, and the charterer or freighter is not clothed with the character or legal responsibility of ownership. . . . Courts of justice are not inclined to regard the contract as a demise of the ship if the end in view can conveniently be accomplished without the transfer of the vessel to the charterer, but where the vessel herself is demised or let to hire, and the general owner parts with the possession, command, and navigation of the ship, the hirer becomes the owner during the term of the contract, and if need be he may appoint the master and ship the mariners, and he becomes responsible for their acts."

And subsequently, in *Leary* v. *United States*, 14 Wall. 607, 610, Mr. Justice Field thus discussed the question:

"If the charter party let the entire vessel to the charterer with a transfer to him of its command and possession and

subsequent control over its navigation, he will generally be considered as owner for the voyage or service stipulated. But, on the other hand, if the charter party let only the use of the vessel, the owner at the same time retaining its command and possession, and control over its navigation, the charterer is regarded as a mere contractor for a designated service, and the duties and responsibilities of the owner are not changed. In the first case the charter party is a contract for the lease of the vessel; in the other it is a contract for a special service to be rendered by the owner of the vessel. . . . All the cases agree that entire command and possession of the vessel, and consequent control over its navigation, must be surrendered to the charterer before he can be held as special owner for the voyage or other service mentioned. The retention by the general owner of such command, possession, and control is incompatible with the existence at the same time of such special ownership in the charterer."

See also *Hooe* v. *Groverman*, 1 Cranch, 214, in which these words in the charter party, " doth grant and to freight let . . . the whole tonnage of the vessel," were held the operative words, and indicating in connection with other language a contract for service rather than a demise of the vessel. *Marcardier* v. *Insurance Company*, 8 Cranch, 39, 49, in which Mr. Justice Story, speaking for the court, said : " A person may be owner for the voyage, who, by a contract with the general owner, hires the ship for the voyage, and has the exclusive possession, command, and navigation of the ship. Such is understood to have been the case of *Vallejo* v. *Wheeler*, Cowp. 143. But where the general owner retains the possession, command, and navigation of the ship, and contracts to carry a cargo on freight for the voyage, the charter party is considered as a mere affreightment sounding in covenant, and the freighter is not clothed with the character or legal responsibility of ownership." *Gracie* v. *Palmer*, 8 Wheat. 605; *McIntyre* v. *Bowne*, 1 Johns. 229; *Hallett* v. *Columbia Insurance Company*, 8 Johns. 272; *Clarkson* v. *Edes*, 4 Cowen, 470; 1 Parsons on Maritime Law, 232, c. 8, § 2.

These authorities, although not all touching the question of

rent, bring out clearly the essential differences between the two kinds of affreightment contracts — the one in which there is a demise of the vessel, a parting with all possession and control, and the other in which the owner, retaining the possession and control, contracts simply for service — it may be the entire service of the vessel.

If the contract is one of the former kind, then rent is payable until the end of the stipulated term and the return of the vessel. In *Havelock* v. *Geddes,* 10 East. 555, 566, there was a demise of a vessel for a term of twelve months, and longer if the defendant should think fit to keep the same. There was a stipulation that the plaintiff, the owner of the vessel, should keep it tight, staunch, etc., and a reduction was sought of rent for the time occupied by defendants in making repairs during the term of the demise. Lord Ellenborough held that no such reduction could be allowed, saying: "The question then is, whether, because the plaintiff has undertaken to keep the vessel tight, etc., the defendants have a right to deduct anything out of the freight they are to pay, in respect of the time which may be taken up in making good such defects as may occur during the period for which the vessel is hired? And we are of opinion they are not. From the accidents to which ships are liable, it was in the ordinary course of things to expect that this ship might want repairs in the course of her voyage; and when the defendants were making their bargain they should have stipulated to deduct for the time which might be exhausted in making those repairs, if they meant to make that deduction. Without such a stipulation, we think the true construction of the charter party is, that whilst those repairs are going on, the ship is to be considered as in the defendants' service, and the defendants liable to continue their payments."

To like effect is the case of *Ripley* v. *Scaife,* 5 B. & C. 167, 169, in which Abbott, C. J., said:

"There is in the charter party an express stipulation for the payment of freight from a certain day, for six months certain; and so much longer as the vessel should be employed by the plaintiffs. There not being any other stipulation for

the case of repairs, I think that the ship was in the employ of the plaintiffs whilst those repairs was going on, and that they were liable to pay freight during that period."

See also *Spafford et al.* v. *Dodge et al.*, 14 Mass. 66, in which a vessel was hired to make a certain voyage " at the rate of three dollars a ton per month, and so in proportion for a less time, as the said brig should be continued in the service of the defendants." While making that voyage she was captured as a prize and detained for several months, but was finally restored, and arrived at her port of destination. It was held that the owner was entitled to rent for the full term of her absence without deduction for the time of the detention in consequence of the capture. And this is but an application of the same rule which controls in other cases of demise. If premises are rented for a term of years at a stipulated rent per year, and no provision for reduction in case of the destruction or injury of the buildings by fire be inserted in the lease, the rent is payable for the entire term and until the premises are returned, and this though the buildings may be injured, or even destroyed by fire. In short, a demise is not ended until the property is returned to the owner, and so long as that demise continues rent is payable at the stipulated price unless there be some provision for a reduction.

No technical words are necessary to create a demise. It is enough that the language used shows an intent to transfer the possession, command, and control. Now by this contract it was stipulated that the petitioner should " provide and furnish to " the government, whenever called upon, during a specified year, " such vessels of the descriptions hereinafter given as may be required to take the place of the vessels now performing service, etc.," and that in case of his failure so to do the government should have " the power to hire vessels elsewhere in open market " at his " sole expense and charge." These are the operative words: The contract is for vessels, and not for any use of them. The vessels are to be furnished to the government; they are to take the place of other vessels, presumably belonging to the government, engaged in a certain service, and if petitioner fails to furnish the needed vessels, the

government may go elsewhere and hire them. There is no stipulation which in terms, or by implication, casts upon the petitioner the management or control of any vessel accepted by the government. That the time for which the vessels were to be employed might be limited by the wishes of the government does not affect the question as to whether, while so employed, they were to be under its exclusive control and management. A demise may be for a day as well as for a year, and may be terminable at the will of the lessor. The pay, by the fourth article, was to be "for each vessel employed."

Not only this, but the conduct of the parties in the execution of the contract removes all obscurity as to its scope and meaning. As the findings show, the vessel, the James Bowen, was furnished by petitioner, and was accepted and used by the defendants. During the time of its use it was under the exclusive management and control of the defendants. The very condition resulted which is the purpose and effect of a demise — the transfer of the exclusive possession, management, and control. The vessel was not, when injured, returned to the petitioner, but when the repairs were finished, "resumed work." It is insisted by the defendants that there was no demise because, as claimed, the petitioner did not contract to furnish one vessel for any length of time, and could, if he wished, change vessels. It is doubtful whether that is a correct interpretation of the instrument, and whether it was in the power of the petitioner, after a vessel had been tendered and accepted by the government, to substitute another therefor. But even if it were so, the substituted vessel would pass into the exclusive possession of the government, the same as the vessel for which it was substituted.

We think little significance is to be attached to the provisions in reference to furnishing a crew or supplying fuel. They were matters of detail affecting the price to be paid, but throwing no particular light on the question of hiring or control. If it be said that the clause requiring the government to furnish fuel was unnecessary in case there was a demise, it may also, in like manner, be said that the further clause as to

the petitioner's furnishing a crew was unnecessary if he was to retain the management and control. Any possible inference from one clause may be set off against a different inference from the other, but neither of them destroys the significance of the operative words of transfer, nor outweighs that of the action of the parties in the execution of the contract.

The claim when presented to the department was rejected on the ground that the "boat was wholly under the control of the owner and his agents and employés." But the findings of fact show that that alleged ground is a mistake; that it was wholly under the management and control of the quartermaster's department. Nothing more need be said. While the question is not free from doubt, yet in view of the fact that the petitioner was to provide and furnish a vessel; that this vessel, when tendered, was accepted, and was not only in the service, but under the exclusive management and control of the quartermaster's department at the time of the accident, we think that it must be adjudged that the case presented is one of a contract of hiring, and not for service, and that the government, during this possession of the vessel, was a special owner, and bound to pay rent for the vessel until returned to petitioner.

The judgment will be

*Affirmed.*

The CHIEF JUSTICE and MR. JUSTICE JACKSON dissented from this opinion and judgment.