Booth, Judge,
dissenting:
My inability to assent to the foregoing judgment rests upon a belief that the transaction involved was a mere contract for service and not a demise of the boats. The numerous letters and acceptances which make up the contract nowhere expressly characterize it as either a contract for service or a demise of the boats; so under the decisions of the Supreme Court the question must be determined by an examination of the contracts and the conduct of the parties thereunder, always giving a construction adverse to a demise of the boats when the issue is doubtful, the courts uniformly leaning toward a contract for service rather than a. demise of the vessel. Leary v. United States, 14 Wall. 607; United States v. Shea, 152 U. S. 178; Reed v. United States, 11 Wall. 591; Donald v. United States, 39 C. Cls. 357.
The rule of law applicable to an ascertainment of the difference between a contract of affreightment and a demise of a vessel is that if the control, possession, command, and navigation of the vessel passes to the charterer, and he becomes. pro hac vice the owner of the same, then the transaction is a demise of the vessel, otherwise it is a mere contract for service. In one instance the parties contemplate a lease of' the vessel and all that goes therewith, casting full responsibility on the owner pro hac vice. In the other, the owner engages to perform a stated service with his vessel for a stated rate of pay.
The findings disclose, first, that the service to be rendered was a per diem towage service, to be paid for by the day,. *515 for a stated period of time. It may not be successfully contended that as to the twelve-hour boats the Government assumed any responsibility for them during the night. At the close of the twelve-hour day they must of necessity be within the ownership of the plaintiff company: Such a contract and such a service is directly in conflict with the idea of a demise of the boats. Second, the plaintiff company agreed to furnish everything for the boats except coal and water, mvi even coal was to be furnished by the plaintiff, i. e., loaded upon the tugs at the cost of the defendant. Furnishing everything included the crew, the one essential element of navigation. Assuredly it is manifest that the defendant had no primary authority or jurisdiction over the crew. The defendant could do no more than direct the commander what cargo to take and where to go to discharge it. The defendant was without authority to enforce discipline with respect to the crew, and could not discharge a member thereof or supply a vacancy therein. One, if not the most serious, complaint of the defendant was lack of sufficient and competent crews. The plaintiff company at no time refused to acknowledge this responsibility. It is nowhere disputed that the plaintiff company employed and paid the crews and that the crews navigated the boats in accord with their judgment and experience as navigators. If the defendant was the owner of the boats fro hae vice, this one stipulation of the contracts is obviously contrary to the usual ones, wherein a demise of a vessel has been held.
An examination of the cases discloses that in cases of a demise of the vessel the owner parts with all control over the same, and he is as effectually dispossessed of the vessel, for the time being, as if he had sold the same. The charterer becomes responsible for all that happens during the life of the charter party and is vested with all the authority and power of an owner.
Nothing militates more strongly against the plaintiff’s contention than the fact that it, through its own crews, navigated the boats between the points necessary to perform the required service, free from the jurisdiction and authority of the defendant. The crews were the agents of the plaintiff and not the defendant.
*516 Third. The plaintiff company assumed and performed the duty of keeping the boats in condition during the time mentioned in the contract. Once in every thirty days it expressly covenanted to “ wash the boilers to maintain operating efficiency.” The plaintiff installed at its own expense, during the contract period, a fire-extinguishing apparatus and added an additional member to the crews. Surely, if the defendant was lawfully in possession as owner, this burden would have been cast on it. Operating efficiency was no concern of the plaintiff company if the defendant was operating the boats as owner thereof. If the defendant took the boats over and was operating them, the duty of keeping them in repair and good order belonged to it, and the cases só hold.
Fourth. The parties themselves have by their own conduct construed the contracts as one for service and not as a demise of the vessels. The Ira M. Hedges sank while towing a barge of coal from Perth Amboy, N. J., to the Erie Basin Dry Dock, and the plaintiff company, at its own expense, raised and repaired her. Such a manifestation of ownership and the assumption of the responsibilities of ownership indisputably stamp the transaction as a direct and unequivocable acknowledgment that title and possession of the boats remained in the plaintiff company. No claim is made in this suit for the expense incurred in this respect, and whatever may have been said or done at this time the plaintiff company did as set forth above, and paid the damages incident to the event. The available cases, without exception, in charter parties construed as a demise of a vessel hold that in cases of collision and sinking the fro hac vice owner is responsible for the losses occasioned thereby. Plant Investment Co. v. United States, 45 C. Cls. 374.
The Hedges was in the physical possession of the plaintiff company during the whole period of her reconditioning. She was of no service to the defendant for a little over fifty-four days out of the charter party time, at a per diem expense of $150 a day, or more than $8,100, being in actual use but twenty-six days out of the full time required. While this is the most aggravated incident of the entire transaction, it necessarily impresses as a clear recognition by the plaintiff company of its legal liability under the contracts to *517 assume the burdens of tlie actual navigation of the boats. The defendant was in urgent need of tug service, the war required the use of every available instrumentality to get the Army overseas, and it is not to be presumed that it would have allowed, under the contracts, this degree of remissness if both the opportunity and the power and authority existed to forestall it. It might have taken over the boats as it did other shipping facilities, and thereby left no doubt as to the character of the transaction. However, in my opinion, it pursued the opposite course and simply employed the vessels for a stated per diem service and a stated per diem rate of pay, without the assumption of title and the correlative responsibilities of an owner fro Kao vice.
Finding Y, if I correctly understand it, is simply intended to disclose the service rendered by the boats, i. e., that while engaged in the service contracted for the defendant had the use of the boats and gave explicit orders as to what towage they were to do, and of course, while so engaged, they were under the exclusive orders of the defendant. The plaintiff could not avail itself of the boats during this period in any other towage service without violating its contracts. The decided cases, however, do not hold facts of this nature as determinative of the issue involved. It is self-evident that under a contract for service the defendant would necessarily have the direction of the boats, and under the terms of the contracts they were subject at all times stated in the contracts to its orders. They were employed by the defendant to do such towage service as it directed. These facts, however, do not convert a contract for service of the boats into a demise of the same. The mere giving of orders as to what barges should be towed, when they should be towed, and by what boats, from point to point, is not in law sufficient to characterize the transaction as taking that measure of control over the boats contemplated in a demise of the same.
The plaintiff’s crews nmigated the boats during all the period of time covered by the contracts. The boats were in the possession of crews employed and paid for by the plaintiff; agents of the plaintiff operated the boats; they directed their course from point of departure to destination through the waters of the harbor; they, as agents of the *518 plaintiff, were responsible for the safety of the boats and cargo aboard. No one might contend that the defendant assumed responsibility for the safe navigation of a boat, when it was without authority to select or discharge the crew which was to navigate it. As was said in Pollock v. Oleveland Shipbuilding Co., 56 Ohio St. 655:
“ Navigation is the science or art of conducting a ship from one place to another, and the science or art of ascertaining the position and directing the course of vessels, especially at sea, by astronomical operations or calculations; a nautical science or art; shipping.” ‘ -
Towage service by tugboats is not the kind of marine service usually involving a demise of tugboats. The very nature of the service itself does not, unless especially contracted for, suggest a taking over of the boats themselves. In the ordinary course of business it would be considered a hired service and no more. The cargo transported is usually aboard a transport of the charterer, and the service of the boats is limited to towing the same from point of embarkation to point of discharge. The crew of the tug navigates the same, and the crew of the transport navigates it in keeping with the tug’s course.