**SALMONS DREDGING CORPORATION
v. HERMA et al.**

No. 5991.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 18, 1949.

Decided Feb. 20, 1950.

Charles W. Waring and Henry T. Gaud, Charleston, S. C., for appellant and cross-appellee.

Thomas H. Middleton, New York City, and Harold A. Mouzon, Charleston, S. C. (Hill, Rivkins & Middleton, New York City, Hagood, Rivers & Young, and Moore & Mouzon, Charleston, S. C., on the brief), for appellees and cross-appellants.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

Salmons Dredging Corporation, in the District Court of the United States for the Eastern District of South Carolina, filed a libel in admiralty against the Norwegian Motor Ship Herma in rem and against the Carolina Shipping Company, as agent for the owner of the Herma, in personam. The Charleston Stevedoring Company was later brought in as respondent-impleaded by the Royal Norwegian Government, owner of the Herma. The libel sought to recover damages for the loss to libelant aris-

ing out of the sinking of its derrick barge Captain Harry. The Royal Norwegian Government interposed by cross libel its claim for damages to the Herma allegedly caused by the sinking of the Captain Harry while moored to the Herma.

After an extended trial, the District Court handed down the following Conclusions of Law:

"(1) The enumerated acts and omissions of the Respondent-Impleaded, and of its employees and agents, were negligent and the direct and proximate cause of the loss of the Libellant's derrick barge Captain Harry and the damage to the Norwegian Motor Ship Herma, without which the loss and damage would not have occurred.

"(2) Such negligence is actionable and imputable to the Respondent-Impleaded.

"(3) The Respondents are liable for the negligence of the Respondent-Impleaded in mismanagement of the Captain Harry.

"(4) The Respondent, Carolina Shipping Company, breached its contract with the Libellant when it failed to return the Captain Harry in accordance with the terms of the aforesaid demise charter.

"(5) The Libellant contributed as a proximate cause to the sinking of the derrick barge Captain Harry and the damage to the Norwegian Motor Ship Herma by providing a vessel that was not so seaworthy as she should have been for the purpose for which she was hired.

"(6) Since both the Libellant on the one hand and the Respondents and the Respondent-Impleaded on the other hand were at fault in respect to the loss of the derrick barge Captain Harry and in respect to the damage occasioned the Norwegian Motor Ship Herma, each is liable for one-half of the damage done to both vessels.

"(7) As between the Respondents and the Respondent-Impleaded the Charleston Stevedoring Company is primarily liable, the Carolina Shipping Company is secondarily liable and the Norwegian Motor Ship Herma is liable thereafter."

The damages to the Herma were fixed by stipulation and the case was referred to a Commissioner to determine the amount of the loss sustained by the libelant due to the sinking of the Captain Harry. The District Court held that the Captain Harry was a total loss and, in overruling exceptions to the report of the Commissioner, the District Court stated: "The exceptions are overruled and the conclusion of the Commissioner, 'that the "Amount of the loss occasioned the Libellant herein due to the damaging and sinking of the Derrick Barge Captain Harry on or about the 25th day of September, 1945" is in the total sum of $112,207.78, with interest on that amount from September 25, 1945, at the rate of six (6%) per annum,' is approved."

The District Court, accordingly, handed down its decree:

"Accordingly, it is hereby

"Ordered that the Libellant have judgment and judgment is hereby rendered against the Respondents and against the Respondent-Impleaded for the sum of Fifty-six Thousand One Hundred Three and 89·/100 ($56.103.89) Dollars, with interest thereon from September 25, 1945, at the rate of six (6%) percent per annum until the same is paid, and for such costs and disbursements as may be properly taxed in favor of the Libellant against the Respondents and the Respondent-Impleaded; and it is further

Ordered that the Claimant, Royal Norwegian Government, have judgment and judgment is hereby rendered against the Libellant for the sum of Two Thousand Two Hundred Sixty-one and 55·/100 ($2,261.55) Dollars, with interest thereon from September 25, 1945 at the rate of six (6%) percent per annum until the same is paid, and for such costs and disbursements as may be properly taxed in favor of the Claimant against the Libellant."

The case is before us on appeals and cross-appeals.

The loaded Herma was aground in the harbor of Charleston, South Carolina. Attempts were made, in which the Captain Harry took part, to float the Herma. These efforts failed. It was then determined to unload the cargo of piles on the Herma into lighters, to float the unloaded ship, then to reload the piles on the Herma.

Accordingly, Carolina Shipping Company, as agent for the Herma, contracted with libelant for the use of the derrick barge Captain Harry for these unloading and loading operations. Carolina Shipping Company, also, engaged a tug to move the Captain Harry (which was not self-propelled) and procured the services of the Charleston Stevedoring Company in connection with this work of unloading and then loading the Herma.

The Captain Harry was an all-purpose marine derrick, used for salvaging, dredging and multiple lead pile driving. The hull was all wood construction and had a measurement of one hundred feet in length, forty feet in width, and eight feet in depth. It contained four steel spudwells. The hull was built of heavy timbers. The planking on the sides was six inches, the bottom rakes four inches. The bottom and sides, to a distance of one foot above the water line, were covered with ship's felt, which in turn, was covered by one-inch creosoted timbers. In the interior were heavy transverse timbers and other bracing. The steel spudwells, in addition to being bolted to the ship's sides, were fastened to the opposite spudwell with eight tie rods through the ship.

There were six steam engines on the Captain Harry, as follows: one three-drum engine (main hoist engine), one sluing or swinging single-drum engine, one 8x10 stern two-drum engine, used for the stern anchors, one reversible deck engine, and two port and starboard two-drum engines.

The hull was built in 1928, and was bought by the libelant in 1938 or 1939. Attached to the hull and superstructure were a stiff leg derrick with 120-foot steel boom, a lifting "A" frame, boilers, wrecking pump, deck house and other machinery and equipment necessary for the proper operation of the vessel. In addition to the machinery and equipment attached to the hull and superstructure, there were various items of loose gear on the vessel at the time of the sinking.

The operation of unloading the piles from the Herma into lighters with the use of the Captain Harry commenced early on September 22, 1945, and continued until the morning of September 24, 1945, when the Herma was floated free and moved a mile or so away into deep water. That same day the Captain Harry was moored broadside to the Herma and the reloading of the piles from the lighters to the Herma was begun.

In the early morning hours of September 25, 1945, the Captain Harry began to list heavily when the loaded derrick boom swung over the hatch of the Herma. About 5:10 A.M. the A-frame of the Captain Harry struck the side of the Herma, the listing of the Captain Harry increased, the cables tying the derrick to the Herma snapped and the Captain Harry sank, at the same time causing injury to the Herma.

We first approach the question of the exact nature of the transaction between Salmons Dredging Company and Carolina Shipping Company as to the employment of the Captain Harry for the operations incident to reloading the piles from the lighters to the Herma. Salmons Dredging Company stoutly asserts that there was a charter-demise of the Captain Harry in the nature of a bailment. Carolina Shipping Company vigorously contends that there was no bailment or charter-demise of the Captain Harry, but that, on the contrary, Salmons Dredging Company undertook the task of reloading the piles on the Herma and that the entire control and supervision of these operations was in the hands of Salmons Dredging Company and the crew of the Captain Harry. Incidentally, this crew consisted of only two men though Salmons Dredging Company agreed to furnish a crew of three men. The District Court held (correctly, we think) that the failure of Salmons Dredging Company to furnish the third crewman in no wise contributed to the sinking of the Captain Harry. This question was discussed at some length by the District Judge, who, in his opinion below stated: "I, therefore, conclude as a matter of fact that under the contract Salmons was only to furnish the Captain Harry with its equipment and crew and all supplies therefor, except perhaps fresh water, and that

Carolina and·/or Herma, for whom Carolina acted, or their authorized agents, was to have full supervision and control of the Captain Harry and its crew during the unloading and reloading operations."

And, subsequently, the Commissioner found: "At the time of her loss the Captain Harry was in the custody and control of the Respondents under a demise which required the Respondents to return her to the Libellant."

We cannot set aside this finding on the score that it is clearly erroneous.

The negotiations between Salmons Dredging Company and Carolina Shipping Company for the employment of the Captain Harry were oral. There was no little conflict in the testimony as to these negotiations and as to the manner and method of the reloading operations from the viewpoint of supervision and control of the work.

■ There is no question that such a demise of the Captain Harry may be created by parol and no precise technical words are required. See, United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403; McGeeney v. Moran Towing Corp., 2 Cir., 149 F.2d 791; Tomkins Cove Stove Co. v. Bleakly Transportation Co., 3 Cir., 40 F. 2d 249.

No useful purpose would be served by a review of all the evidence here. A careful inspection of the record convinces us that the legal relationship here was that of a bailment, with the rights and duties thereunto appertaining. The testimony of Captain Salmons, Gatewood Smith, McCall, Strobel and Captain Taylor supports this conclusion.

There is no little force in this extract from the District Judge's opinion: "Moreover it appears that the character of the operations involved in the unloading and reloading of the Herma required the supervision of some responsible overhead authority. Derrick barges were used in the operation, one of them the Captain Harry. Lighters were used to receive the cargo which was unloaded from the Herma and they were also put· to use in reloading the same cargo. Longshoremen were neces-

sary and were used in both operations, and so were tug boats. Then too the Herma's crew had a part in the operations. It is hard to understand how such operations could have been safely and efficiently carried out in the absence of a directing head. It is not sufficient to say that the labors performed by the several parties were integrated. Confusion undoubtedly would have resulted if each of the five agencies concerned had operated independently of the others, even if that could have been done. Two or more of them must have been operating simultaneously at all times. It perhaps is valid to say that the agencies at work were integrated, but even so the integration must have been accomplished by a directing head and that head undoubtedly was Stevedore, placed in that capacity by Carolina, the authorized agent of Herma. Anyway that seems to be the most reasonable deduction from the evidence."

To this we add the observation that such directing head could hardly have been one of the crew of the Captain Harry. The nature of their duties and the logic of the surrounding facts cry out against any such conclusion. This seems quite obvious from the testimony of derrick operator Harold Smith and deck hand Chisolm as to the nature of their duties on the Captain Harry. No officer of Salmons Dredging Corporation was on board the Captain Harry during the reloading operations, which were apparently carried on under the direction of Strobel, the stevedoring foreman.

The District Judge held (as indicated above) that the Captain Harry was unseaworthy and that this condition was a proximate cause of her sinking. The testimony of Captain Salmons was definitely explicit that the Captain Harry was in excellent condition when he accepted delivery from the Navy in early August of 1945. This was confirmed by the testimony of other witnesses. There was not a shred of evidence that any cracks in the wooden hull of the Captain Harry had actually been opened by the action of the sun while she lay at Ship Yard Creek between the date of the delivery of the Captain Harry

to Salmons and the date when she sank—in the early morning of September 25. The District Judge merely stated that since the Captain Harry was light, the hot summer sun of Charleston might have had the effect of opening the seams on that part of the barge which was above the water line during her berthing at Ship Yard Creek, while this part of the Captain Harry would have been beneath the water when she was loading and unloading the Herma. The time that the Captain Harry lay thus in Ship Yard Creek is important here, as Captain Salmons brought out in his testimony.

We think, too, that the District Judge minimized the importance of the inspection of the hull of the Captain Harry made by Smith and Chisolm, the crew of the Captain Harry, less than an hour before the sinking of the Captain Harry. It is true that this inspection was not as thorough and complete as it might have been, yet there was very positive testimony by Smith and Chisolm that there was then a very small amount of water in the hold of the Captain Harry. Chisolm emphasized the fact that he could clearly see the timbers in the bottom of the hold which were not covered by the water.

There was also testimony that when, as a result of this inspection, the gasoline pump on the Captain Harry was started, the pump sucked air instead of pumping water when the Captain Harry listed away from the pump which was located on the starboard side of the Captain Harry. The intake of the pump was only a few inches above the bottom of the hold so that had there been an appreciable amount of water in the hold at that time, the pump would not have sucked air but would have pumped water, even when the Captain Harry listed.

There is not a shred of testimony by anyone that the Captain Harry was so low in the water as to present any peril, even a very short time before the sinking of the derrick. Had any appreciable amount of water leaked into the Captain Harry, she would of course, have settled somewhat in the water and this would certainly have been noticed by those on the Captain Har-

ry, on the Herma and on the barge from which the piles were being lifted.

It should be noted, too, that when the Captain Harry was engaged in a fruitless effort to pull off the Herma while the Herma was aground, and also all during the operations while the piles were unloaded from the Herma to the barge so that the Herma might be floated, there was never a suggestion by anyone that the Captain Harry was leaking.

The strongest testimony tending to show that the Captain Harry was unseaworthy was the manner in which she sank. Leverman Smith was not entirely clear on this point though he did testify that she must have been full of water or she would not have sunk. There was testimony that when the cables tieing the Captain Harry to the Herma snapped, the Captain Harry first righted and then sank straight down. This righting of the Captain Harry, though, would normally result from the snapping of these cables, whether or not she was then full of water.

The testimony of Smith and Chisolm and that of Stevedoring Foreman Strobel is far from clear as to the specific happenings immediately preceding the sinking of the Captain Harry. There is, however, a rather rational explanation of this. Smith and Chisolm were immediately concerned with saving their lives and had great difficulty in getting off the Captain Harry and onto the barge beside the Herma, and Strobel's immediate concern was to avoid being hit by the boom and falls and bridle. As a matter of fact, Strobel was so injured.

A very vital thing here is the large hole torn in the deck of the Captain Harry. No one on the Captain Harry, the barge or the Herma gave any testimony at all about this hole. That there was such a hole in the deck of the Captain Harry is very clear from the testimony of the diver, Koveleski, who went down after the sinking.

It is Salmons' contention that this hole was torn in the deck before the Captain Harry sank and that water pouring into this hole really caused the Captain Harry

to sink. Respondents, however, contend that this hole was not torn in the Captain Harry before she sank but as a result of the sinking. If Salmons' contention here is valid, this would explain the sudden sinking of the Captain Harry even if she were the most seaworthy derrick barge in the world.

It is difficult to see how this hole could have been made in the deck after the sinking and as a result of the sinking. It seems much more probable that the hole was made before the sinking. Smith testified that the Captain Harry had, before sinking, turned to an angle of about 60%, that there was water pressing on the deck except for about two feet of the deck upon which Smith stood.

█ We have already quoted the District Court's Conclusion of Law No. 5: "The Libellant contributed as a proximate cause to the sinking of the derrick barge Captain Harry and the damage to the Norwegian Motor Ship Herma by providing a vessel that was not so seaworthy as she should have been for the purpose for which she was hired."

With all deference to the District Judge, who saw and heard the witnesses, we feel constrained to set aside this conclusion as being clearly erroneous.

In this connection, we quote from the Report of the Commissioner:

"In 1939, the Captain Harry was dry-docked and overhauled. In 1942, the vessel was again dry docked and thoroughly overhauled. Later in 1942, the vessel was leased to the United States Navy for war purposes, under an agreement that it was to return the vessel in first-class and seaworthy condition and in as good condition as it was received.

"In 1945, the vessel was again thoroughly overhauled by the United States Navy, and it, and all engines and other equipment were returned to Libellant and accepted by it as being in first-class condition. * * *

"On the basis of all the testimony before me, I find that the Captain Harry just before her sinking on September 25, 1945, was in excellent, first-class condition * * *."

From the District Court's Finding of Fact we quote: "When the Captain Harry listed over so as to strike the side of the Norwegian Motor Ship Herma, gaping holes were made in her deck and hull, through which large quantities of water entered into the hull."

It is interesting, too, that in proposing hypothetical questions to witnesses at the hearing before the Commissioner, counsel for respondents several times assumed that this hole was made before the sinking of the Captain Harry.

We are, accordingly, led to the conclusion that the Captain Harry was seaworthy at the time of her sinking.

█ In its Conclusions of Law, numbers 1 to 4 (set out above), the District Court held that Charleston Stevedoring Company (respondent-impleaded) was negligent in management of the Captain Harry, that this negligence was a proximate cause of the sinking of the Captain Harry, and that the respondents are liable in damages to Salmons Dredging Company. These conclusions we must uphold.

Captain Salmons testified that for operations such as those in question, the proper method of mooring the derrick to the Herma was at an angle of 45°, with the bow of the derrick moored to the Herma and with a stern anchor, to keep the derrick in position. This was the method used successfully when the piles were unloaded from the Herma to the barge. The Herma, however, was fast aground which made this method of mooring easier than when the Herma was afloat and yawing with the tide. There was also evidence to confirm Salmons as to the proper method of mooring the derrick. It is, of course, elementary that the loading and unloading operations had much less chance of overturning the derrick when she was thus moored since the strain of the operation of the boom would be distributed along the longer length of the derrick rather than across the shorter width of the derrick. It is much easier to over-

turn any boat by putting any weight or strain on either side of the boat than it is by putting this weight or strain on the bow or stern of the boat.

Captain Salmons further testified in no uncertain manner that he told the respondents that the derrick should be moored at a 45° angle during the reloading operations but that respondents protested against this. Salmons stated that a strong reason for this protest by the respondents was not on the score of the comparative safety of the two moorings but that in order to moor the derrick at a 45° angle, it would take a larger and more expensive tug than it would take to moor the derrick broadside, as was done. Salmons was on the tug Josephine that took the Captain Harry out to the Herma for the reloading of the piles. Respondents make much of the fact that during the mooring of the derrick alongside the Herma, Captain Salmons took an active part in the mooring operations. Salmons tried to minimize his part in the mooring and stated that after his protest against a broadside mooring had been overruled, there was nothing for him to do but to carry out the wishes of the respondents who, according to him, were in complete charge of the reloading operations. There is no question but that the respondents hired the tug Josephine that took out the Captain Harry, which was not self-propelled, to the Herma for the reloading of the piles.

There was a good deal of testimony on both sides as to whether it was feasible to moor the Captain Harry to the Herma at an angle of 45°, even with a stern anchor, while the Herma was afloat, which would necessarily result in some yawing as a consequence of the tide in Charleston Harbor.

There was also some expert testimony as to the precise effect of the ebb-tide when the Captain Harry was moored broadside to the Herma. This testimony seemed to show that by virtue of the damming of the water by such method of mooring, and the suction, that the broadside method of mooring did add to the danger of capsizing the Captain Harry when she listed, due to the movements of her boom.

Respondents try to make much of the fact that just before the sinking of the Captain Harry, Stevedoring Foreman Strobel, even when he was apprized of the unnatural listing of the Captain Harry and the consequent danger, could have done nothing that would have kept the Captain Harry from sinking. At least one answer to this is that Strobel could have then stopped the reloading operations which he must have known were fraught with obvious peril.

There was no little evidence that holding the boom loaded with a pile too long over the hatch of the Herma served to accentuate the listing of the Captain Harry and therefore contributed to her sinking. Leverman Smith was very positive on this point. He testified that as a result of this, it was necessary for him to crowd on extra steam which also added to the amount of the listing done by the Captain Harry. There was also some testimony that the manner of handling the piles in connection with their entry into the hold of the Herma was improper. Smith and Chisolm, on the Captain Harry, could not see the hatch of the Herma into which the piles were being loaded.

On the whole picture, then, we must uphold the finding of the District Court that there was negligence on the part of the respondents contributing to the sinking of the Captain Harry.

It follows, therefore, that the damages for the sinking of the Captain Harry must be assessed *in toto* against the respondents, and not, as the District Court held, one-half against Salmons Dredging Corporation and one-half against the respondents. Further, Salmons Dredging Corporation must be relieved of any share of the damages caused to the Herma by the sinking of the Captain Harry.

 We do not think, however, that the valuation placed upon the Captain Harry by the Commissioner and affirmed by the trial judge can be accepted in the assessment of damages. The assessment was manifestly erroneous in several respects. viz.: (1) it proceeded upon the erroneous

theory that, in the absence of evidence to establish market value, reconstruction cost with depreciation should be accepted, to the exclusion of other considerations; (2) that, in the face of preponderant evidence that a progressive depreciation rate of 5% was proper, a rate of 2½% was adopted; and (3) that reconstruction cost based upon bids rather than the opinions of expert appraisers should be accepted. The result was that the cost of reconstruction was found to be $147,101, the average of the estimates submitted by libelant's witnesses. This depreciated at 2½% for 18½ years gave a value of $92,109.94, to which was added the sum of $20,097.84, the value of wire rope and gear lost at the time of the sinking and the cost of raising the wreck to ascertain whether she was worth repairing.

The hull of the Captain Harry was bought by libelant in the year 1938, when she was around ten years old, for the sum of $10,000. She was then equipped by libelant with second hand machinery, the purchase price of which is not shown. The boat and machinery were depreciated on libelant's books, presumably in good faith for income tax purposes, so that, at the time of the loss, the depreciated value was only $1,095. During the war the machinery was taken off the boat and she was leased to the government at the rate of $1 per month. At the end of this service she was repaired by the government, the machinery was replaced and she was returned to libelant in good order and condition, but no service was found for her and she lay up idle for a month or more in Ship Yard Creek until the stranding of the Herma, when she obtained her first employment. While it is true that no sales of derricks in this immediate territory were shown near the time of the loss, it is also true that only two years later a larger and better derrick was offered for sale by the United States, and that the only bids received for her were $11,000 and $26,000, and that libelant submitted no bid whatever, although it does not appear that it had in the meantime obtained a derrick to take the place of the Captain Harry. In the light of these facts, we do not see how a valuation of $92,109.94 for the Captain Harry can possibly be justified.

We realize, of course, that weight should be given to reconstruction costs and that these costs were high in September, 1945. The disinterested and highly qualified expert witnesses who testified for respondents, however, estimated the reconstruction cost of the hull at only around $45,000; and, as respondents point out, when the cost of machinery and spudwells is added to this and the whole is depreciated at the 5% rate, which seems proper, a value of only $34,056 is obtained. It should be noted that these expert witnesses were given the same plans and specifications as a basis for this testimony as were used by the Charleston witnesses of libelant as a basis of their bids. Even if the reconstruction figures of libelant, $147,101, be taken and the 5% depreciation rate be applied to them, the value obtained is only $56,928.07. Respondents argue that, because the derrick has been placed in first class condition, no account should be taken of depreciation. This is not a sound argument. Boats and machinery depreciate with age, notwithstanding they are constantly repaired and are kept in good condition; and because this fact is well known, their value is affected with the passage of time, whatever the extent of the actual depreciation. We see no reason, therefore, why the 5% depreciation, which the testimony shows to be the rate generally applied, should not be applied in this case.

It is significant that at the taking of testimony before the Judge, Captain Salmons testified that before abandoning the Captain Harry he figured that the cost of raising her, putting her in dry dock and having her repaired would be close to $50,000 and that he then decided to move off what machinery he could and let the hull go. This, of course, is unequivocal testimony that Salmons did not consider the hull of the Captain Harry and the machinery which he did not move off to be worth more than $50,000, and this conclusion is not materially impaired by the subsequent testimony that he was referring to the cost of repairing the hull. It is clear in the light of

other testimony that the cost of repairing the hull was the important element, in comparison with which the repairing of the machinery was a minor item. There was expert testimony to the effect that the Captain Harry could have been raised for $22,305 and the repairs were estimated by the same witness at around $6,000. We are not satisfied with this estimate as to repairs for the reason that the witness excluded from consideration a portion of damage to the hull due to the pulling away of one of the spudwells. It indicates pretty clearly, however, that Captain Salmons' original estimate of $50,000 for raising and repairing the derrick was not far wrong.

Libelant argues that the derrick had an earning power of from $250 to $400 per day, and that this should be taken into account in valuing her. We are not impressed with this argument. The high charge made for the use of the derrick was, of course, because the opportunities for such use were infrequent; and, in this connection, the fact that the Captain Harry remained idle from the time that she was turned back by the government in August until she was called on because of the stranding of the Herma should not be overlooked. If a derrick such as this could earn $80,000 a year, as argued, it does not make sense that libelant would abandon her when another could not be had, and when she could have been raised and repaired for much less than she could earn in a year. Nor does it make sense that no more than $26,000 should be offered for an even better derrick only two years later, when prices were up 10%.

Viewing the evidence as a whole, we think that libelant will be adequately compensated for its loss if there is allowed it for the loss of the derrick the sum of $50,000 together with the sum of $20,097.-84 allowed by the court below to compensate for wire rope and gear lost when the Captain Harry was sunk and for the cost to which libelant was put in raising the wreck to ascertain whether she was worth repairing.

The decree appealed from will be set aside and the cause will be remanded to the District Court with direction to enter decree for libelant as herein indicated. The costs on appeal will be divided.

Reversed on both appeals and remanded.