**MARINE EQUIPMENT, INC., Libelant,**

v.

**T. H. MARTIN, d/b/a Martin Gravel Company, Respondent.**

**No. 604. Admiralty.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

May 26, 1960.

Phelps, Dunbar, Marks, Claverie & Sims, James B. Kemp, Jr., New Orleans, La., proctors for libelant.

D'Amico & Curet, Sam J. D'Amico, Baton Rouge, La., proctors for respondent.

J. SKELLY WRIGHT, District Judge.

The barge ME–1 is a riveted steel-deck barge 200 feet in length, 40 feet wide, and 11 feet in depth. In 1956, when she was chartered by libelant to respondent, she was 30 years old. Under the terms of the charter, respondent agreed to redeliver the barge to the owner "in like good order and condition as when delivered (fair wear and tear not avoidable by first-class maintenance excepted), * * *." Under the charter respondent also agreed "that barge is in all respects fit and seaworthy for the purposes of this charter, that Owner makes no express or implied warranty of fitness or seaworthiness of any kind whatsoever, * * *."[1]

Before being chartered to respondent, the ME–1 was under two successive six-month charters to one Hebert Frederick, the first beginning May, 1955, and the second September, 1955. Frederick used the barge to transport gravel. In October, 1955, respondent entered the gravel business and engaged Frederick to transport gravel for him, Frederick using a tug and the ME–1 for this purpose. Some time in early 1956 the Frederick tug sank and respondent hired the Choctaw Towing Company thereafter to tow the ME–1. Since respondent had been paying the charter hire to libelant for Frederick during the time Frederick was carrying his gravel, Martin continued to do so after the elimination of Frederick from the scene through the sinking of his tug.

Subsequently, on April 25, 1956, the written charter in suit was entered into between libelant and respondent. On June 30, 1956, during the term of this charter, the ME–1 suffered a marine casualty in Grand Lake near the Atchafalaya River, which casualty resulted in her sinking. The owner's insurance representatives succeeded in having the barge refloated, brought first to the Berwick Bay Shipyard on July 4, 1956, and then later, when it appeared that that yard had no drydock facilities available, to Avondale Marine Ways, Harvey Canal, Louisiana, arriving there approximately on July 10, 1956.

Survey of the vessel at the shipyard disclosed that, in addition to a hole in the rake of the barge, which caused her

---

1. The charter also provides:
"* * * Delivery of barge shall be conclusive acknowledgment by Charterer of thorough internal and external inspection of barge, or waiver of such inspection at Charterer's risk."

to sink, there was body damage in the form of indentations around the knuckles, probably caused from striking underwater objects such as stumps. Also, before work on the barge could be started, a substantial amount of sand and gravel which had found its way into her interior had to be removed.

Under the charter, the owner agreed to insure the hull against marine casualty, minus a $500 deduction, which respondent here is ready and willing to pay. The insurer, admitting responsibility under its policy for the salvage and the cost of repairing the hole in the rake, refused to pay for the knuckle damage, asserting that this damage resulted from a series of minor accidents, all of which would be below the $500 deductible. In this action, libelant is demanding that the charterer pay for this knuckle damage as well as the cost of removing the sand and gravel from the interior of the barge.

■ Under the law of bailment, which applies to the demise [2] of a vessel by charter party, the owner must allege and prove negligence on the part of the charterer in order to recover damages caused during the term of the charter party. However, where the owner proves that the vessel was delivered to the charterer in good condition and returned in a damaged state, the owner has made out a prima facie case of negligence, and the burden of going forward with the evidence is upon the charterer to prove that the damage did not result from his negligence.[3]

Here there has been no proof whatever offered by the libelant as to the condition of the barge at the inception of the charter. Prior to this charter,

the last time the ME–1 was surveyed was in May, 1955,[4] before the first Frederick charter began. Between that date and the sinking of the ME–1, the barge was not even inspected. As a matter of fact, there is no evidence which would indicate that the representatives of the owner even saw the barge between its first delivery to Frederick and its return to the owner at Avondale after the sinking. All of the evidence as to the condition of the barge at the inception of the charter in suit comes from respondent's witnesses. And they show that, other than the hole in the rake which caused the sinking, the ME–1 was in relatively the same condition, as far as they could see without drydocking, after, as before, the charter.

■ The simple fact is that the owner, libelant here, because of the informal manner in which it handled the chartering of the ME–1, is not in a position to prove the condition thereof at the inception of the Martin charter. The owner attempts to relieve itself of the obligation of showing that condition by pointing to the provisions of the charter which provide that "Charterer agrees that barge is in all respects fit and seaworthy for the purpose of this charter, that Owner makes no express or implied warranty of fitness or seaworthiness of any kind whatsoever," and "Delivery of barge shall be conclusive acknowledgment by Charterer of thorough internal and external inspection of barge, or waiver of such inspection at Charterer's risk."

Libelant's reliance on these provisions of the charter will not do. Its own marine surveyor testified that the knuckle damage, which it would have respond-

2. See Leary v. United States, 14 Wall. 607, 610, 81 U.S. 607, 610, 20 L.Ed. 756; Reed v. United States, 11 Wall. 591, 600, 78 U.S. 591, 600, 20 L.Ed. 220. Also, Gilmore and Black, The Law of Admiralty, § 4–20.

3. Richmond Sand & Gravel Corp. v. Tidewater Const. Corp., 4 Cir., 170 F.2d 392; The E. T. Halloran, 2 Cir., 111 F.2d 571; Kenny v. City of New York, 2 Cir., 108

F.2d 958. All authorities are not in accord as to the reciprocal burdens of bailor and bailee. See 6 Am.Jur., Bailments, §§ 371–383. All hold, however, that the burden is on the bailor to prove the condition of the vessel at the beginning of the bailment.

4. This survey shows much of the damage which libelant here attributes to Martin.

ent repair, did not make the vessel unseaworthy; that it did not make the barge unfit for the use intended; that it was damage customarily found in barges; and that it had occurred over a long period of use. The provisions of the charter relied on by the owner, therefore, are irrelevant to a consideration of respondent's liability for the knuckle damage. The relevant provision of the charter reads that the respondent will redeliver the barge to the owner "in like good order and condition as when delivered." The only proof in the record as to the condition of the barge on delivery to respondent is respondent's proof. And that proof, as stated, shows the condition on delivery to be the same as on redelivery, other than the hole in the rake which caused the sinking, the repair of which is covered by the owner's insurance policy.

What has been said with reference to the condition of the barge at the time of delivery by, and redelivery to, the owner, is equally applicable to the claim of libelant for the costs of removing the sand and gravel found in the barge's interior. There is no proof in the record as to when that sand and gravel found its way into the barge. Consequently, there is no obligation on Martin to pay for its removal.

There is, however, one claim, other than the $500 deductible, which is well founded. That is the claim for charter hire until redelivery of the barge to the owner. The charter in suit was a demise of the barge to Martin. Under a demise "rent is payable until the end of the stipulated term and the return of the vessel." United States v. Shea, 152 U.S. 178, 188, 14 S.Ct. 519, 522, 38 L. Ed. 403. While the charter here was cancellable by either party on three days' notice, the vessel was not returned to her owner until July 10, 1956, when it was delivered to Avondale Marine Ways near New Orleans. Respondent is liable, therefore, for charter hire until that date as well as for the $500 deductible.

Decree accordingly.