HAWTHORNE, Justice.
 

 William N. Rojas seeks to recover $13,-700 from Vincent Robin III, alleging that the defendant breached a contract of lease by failing to return to plaintiff a boat named Miss Wendy and by failing to take all reasonable and necessary precautions for the preservation of the vessel while it was in his care, custody, and control. In the alternative only, plaintiff alleges that in the event the court should find that the defendant Robin was not acting for himself, then Robin was acting as agent for Eustis Engineering Company, a partnership composed of J. Bres Eustis and Charles Bragg, in the lease of the vessel, and the partnership is liable for the breach of the contract.
 

 After trial on the merits the .district court rendered judgment in favor of plaintiff and against the defendant Robin for the amount prayed for, $8,000 of this amount being for the value of the boat and $5,700 for deprivation of the use of the vessel and resultant loss of income. The suit against Eustis Engineering Company was dismissed. Robin appealed. Rojas also appealed so as to preserve all of his rights against the other defendant, Eustis Engineering Company, and in this court he prays that he have judgment against Eustis on his alternative demand if the judgment against Robin is reversed.
 
 [1]
 

 Robin is the owner of a fleet of boats which he rents. He also acts as agent for other boat owners in renting their boats and is paid a commission for handling their business. Knowing all these facts, Rojas listed his 30-foot cabin cruiser, Miss Wendy, with Robin and requested that the latter find a job for it.
 

 Eustis Engineering Company, hereafter called Eustis, had a contract with the State of Louisiana to make test borings in the Mississippi River in connection with the foundation work on the new Mississippi River bridge to be located at New Orleans. In connection with this work Eustis had leased from Jack Neilson, who was also engaged in the boat rental business, a number of barges, which were anchored near the bank and extended out into the river. While this work was in progress, Bragg, one of the Eustis partners, got in touch with Neilson and requested him to furnish
 
 *1103
 
 the partnership with a boat to, 'transfer workmen to and' from the' barges and the shore, and told Neilson
 
 that he wanted this boat on a 24-hour
 
 basis, with the operator of the boat to run the light plant which provided lights on the barges at night to protect them from traffic on the river. According to Bragg’s own testimony, he requested that Neilson secure a boat for him, and. this' request, according to'Bragg, gave Neilson the authority to rent the boat from someone else.
 

 Upon receipt of this request from Bragg, Neilson, not having a boat of his own available, called the defendant Robin. Robin in turn got in touch with the plaintiff Rojas, owner of the boat Miss Wendy, and informed him that there was a job available for his boat which would last two or three weeks, and that Robin would receive the money paid by Eustis, out of which he would remit to Rojas $30 a day, keeping anything above that amount for his commission. Robin told Rojas to take his boat to the barges where Eustis was performing its work under the contract. Rojas did so the following morning, and was there told by the foreman in charge of the work what his duties 'were to be. In this connection Rojas was informed that the boat was to be on the job 24 hours a day transporting workmen from the barges to the shore both in the evening and in the morning, and that he, Rojas, was during the night to refuel the generator which furnished electricity for the lights on the barges.
 

 Rojas remained on his boat and. performed his duties in connection with the lights for about six nights, and, according to Rojas, he then informed Eustis’ foreman that he could no longer tend the light plant. He also told Robin that he needed relief from his duties at night as he had another boat he had to take care of, and asked that a watchman be hired. Robin, according to his testimony, immediately called Neilson, and Neilson in turn called Bragg, one of the partners, who authorized the hiring of a watchman. Bragg admitted at the trial that he was contacted about this matter by Neilson, and according to Neil-son’s testimony Bragg told him to go ahead and tell Robin to get the watchman: Robin thereafter asked Alex Guidry whether he wanted to go to work, and when Guidry said he did, Robin took him to the Eustis job.
 

 Although the testimony is in conflict as to'what the duties of the watchman were, and as to the duties and responsibilities of which Rojas was relieved, we are impressed by the testimony of a disinterested witness, Guidry, the watchman employed, who stated that he was told to
 
 stand watch over the barges and the boat Miss Wendy,
 
 and to run the light plant. After acting as watchman for a few nights, Guidry quit. ' According to his testimony, he informed Robin of this fact early in the
 
 *1105
 
 morning. However, Robin denies this. Be that as it may, the next night — July 19 — the watchman did not come to work. According to Rojas, when he tied up his boat Miss Wendy to the barges at the end of the day, Robin was waiting for him and told him that the watchman had quit. Rojas informed Robin that he could not stay on the boat that night, and left. When Rojas returned to the barges the next morning, Miss Wendy was missing, and in spite of diligent search has never been found. This suit followed.
 

 As this case concerns the rights of various individuals under a contract for the lease of a vessel operating on navigable waters — the Mississippi River — , we are of the opinion that maritime law must be applied to a solution of the problem here presented.
 

 Article III, Section 2, of the Federal Constitution extends the judicial power of the United States to all cases of admiralty and maritime jurisdiction, and Article I, Section 8, confers upon the Congress the power to make all laws necessary to carry into execution the foregoing powers. Pursuant to these powers the Congress gave to the federal district courts exclusive original jurisdiction of civil causes of admiralty and maritime jurisdiction, saving to suitors “all other remedies to which they are otherwise entitled.”
 
 [2]
 
 See 28 U.S.C.A. § 1333. As this is an action
 
 in personam
 
 on a maritime contract, and is not a proceeding
 
 in rem,
 
 the state court has concurrent jurisdiction with the federal district courts. See Johnson v. Chicago & Pacific Elevator Co., 119 U.S. 388, 7 S.Ct. 254, 30 L.Ed. 447; Madruga v. Superior Court of State of Cal., 346 U.S. 556, 74 S.Ct. 298, 98 L.Ed. 290; Benedict on Admiralty (6th ed. 1940) v. 1, c. IV. However, where a state court has jurisdiction of a suit involving a maritime contract, the state court must follow substantive maritime law. Madruga v. Superior Ct., supra; Garrett v. Moore McCormack Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239; Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086.
 

 In maritime law the contract for the lease of a vessel is called a charter party. There are two distinct types of chax-ter party — (1) the demise or bare boat charter, by which the vessel is turned over completely to the charterer, who mans her and operates her throughout the period of hire and becomes her owner for that time, and (2) other types of charter, either time or voyage, by which the owner of the vessel agrees to carry cargo provided by the charterer and which leave the control or management of the vessel in the hands o.f
 
 *1107
 
 her-owner. Fish v. Sullivan, 40 La.Ann. 193, 3 So. 730; Leary v. U. S., 14 Wall. 607, 20 L.Ed. 756.
 

 In Leary v. U. S., supra, the United States Supreme Court said:
 

 “There is no doubt that under some forms of a charter-party the charterer becomes the owner of the vessel chartered for the voyage or service stipulated, and, consequently, becomes subject to the duties and responsibilities of ownership. Whether in any particular case such result follows must depend upon the terms of the charter-party considered in connection with the nature of the service rendered. The question as to the character in which the charterer is to be treated is, in all cases, one of construction. If the charter-party let the entire vessel to the charterer with a transfer to him of its command and possession and consequent control over its navigation, he will generally be considered as the owner for the voyage or service stipulated. But, on the other hand, if the charter-party let only the use of the vessel, the owner at the same time retaining its command and possession and control over its navigation, the charterer is regarded as a mere contractor for a designated service, ■and the duties and responsibilities of the owner are not changed. In the first case the charter-party is a contract for the lease of the vessel; in the other, it is a contract for a special service to be rendered by the owner of the vessel.”
 

 In Reed v. United States, 11 Wall. 591, 600, 20 L.Ed 220, the court said:
 

 “Affreightment contracts are of two kinds, and they differ from each other very widely in their nature as well as in their terms and legal effect.
 

 “Charterers or freighters may become the owners for the voyage * * * as in cases where they hire the ship and have by the terms of the contract, and assume in fact, the exclusive possession, command, and navigation of the vessel for the stipulated voyage. But where the general owner retains the possession, command', and navigation of the ship and contracts for a specified voyage, as for example, to carry a cargo from one port to another, the arrangement in contemplation of law is a mere affreightment sounding in contract, and not a demise of the vessel, and the charterer or freighter is not clothed with the character or legal responsibility of ownership.”
 

 With reference to the rights and liabilities as between the charterer and the owner of the vessel, Robinson in his Handbook of Admiralty Law in the United States (1939) Chapter 12, p. 598, says:
 

 “Whether the charter is a demise or a contract of service, certain rights and liabilities between the charterer and owner are the same. Primarily the owner must supply a.proper ship and the charterer on his part must pay for its use. If the charter
 
 *1109
 
 is of the demise sort, the charterer pays for the use of the ship itnless he is deprived of its use by the act of the owner. Deprivation by other causes does not hold its payment. * * * The destruction of the subject matter of the contract relieves him where he is not at fault. . If he is at fault he is of course liable to the owner for the loss of the ship and her use.”
 

 The same authority at p. 608 if. tells us:
 

 “The charterer’s primary duty to the owner is to pay the hire for use of the ship. If she is demised this duty may go on despite the charterer’s inability to make use of her. The charterer has also the duty to care for her and to redeliver her at the expiry of the charter period. * * * The obligation of the demise charterer to return the ship in good order at the end of the lease is, of course, excused if disaster overtakes the vessel through some fault of the owner. If the fault of the charterer himself has brought about the loss, the liability rests on him. Merely as a demise charterer, however, he is not an insurer of the vessel’s safety. As Judge Ward put it in The Moran No. 10, D.C.N.Y.1924, 41 F.2d 255, at page 256: ‘The law of the subject is well settled. The charterer is liable for any damage to the boat resulting from his own negligence or the negligence of any one to whom he intrusts her. The burden of proving negligence is upon the owner, but he makes out a prima facie case, if he can go no further than to show that the boat was damaged during the charter period and then the burden of explanation, or, as it is sometimes said, of carrying on, lies upon the charterer. In the absence of exculpatory evidence, a presumption of negligence arises against him. * * * This is the established law as to the obligation of the bailee in bailments for hire.’ The questions arise chiefly in cases of informal or oral contract. * * *
 

 5[i ^¡i
 

 “Concerning the liability for the ship no such questions arise in the charter types which leave the owner in full possession of his own vessel. Her safekeeping is at all times his own charge. * * * ”
 

 It is argued by counsel for Robin thát as to him the lease of the boat was not a bare boat charter under maritime law, but one of the other types of charter under which the vessel is retained in possession by the owner, and accordingly the risk of loss was at all times on the owner Rojas.
 

 We do not think that Robin was the charterer of the boat in question. As Rojas himself admits, the boat was never delivered to Robin and was not in his care, custody, or control, and Rojas did not look to Robin for the return of his boat. Accordingly in this, transaction Robin was simply acting as a broker, and in our opinion the district judge erred in rendering judgment against him on plaintiff’s 'main demand.
 

 
 *1111
 
 We will now discuss Rojas’ claim against Eustis..
 

 There were no direct negotiations between Eustis Engineering Company and Rojas. However,- there is not any doubt that Eustis requested its agent Neilson to furnish it with a boat on a 24-hour basis, and Neilson did just that. Even Bragg, one of the Eustis partners, as we have pointed out, admitted that there were no restrictions or limitations on Neilson as to where he was to get the boat. Neilson rented the boat from Rojas through the broker Robin.
 

 Eustis argues that Neilson had no right to delegate to Robin his authority to charter a boat, and that the partnership is not bound by any contract made by Robin with Rojas for the rental of the boat. We do not think that there was any delegation of authority by Neilson. What Neilson did was simply to comply with the instructions of his principal by chartering a boat, which he procured through Robin’s boat rental agency. However, even if we concede that there was a delegation of authority, the fact remains that Eustis ratified the chartering of the vessel by assuming its control and possession for the purposes chartered and paying the rental for it.
 

 Eustis was therefore the charterer •of the vessel in question, and this brings us to the nature of the charter- — that is, whether is was a bare boat charter or some other type of charter.
 

 In this connection, we are impressed with the fact that this boat was chartered by Eustis on a 24-hour basis. It is true that the owner Rojas was operating the boat during the day, but in doing so he was acting only as the servant or employee of Eustis, having leased his services as well as the boat, and it was his duty to use the boat under the directions of Eustis’ foreman, from whom he received his orders. Cf. Ames v. New Orleans & R. R. Transportation Co., 36 La.Ann. 479. Since the Miss Wendy was chartered by Eustis on a 24-hour basis, we do not think anyone will argue that Rojas could have made any other use of the vessel during the charter period. It is therefore our conclusion that the vessel was under the command, possession, and control of Eustis Engineering Company, particularly after Rojas was relieved of his duties as watchman and those duties were assumed by a man hired by Eustis through Robin. Moreover, in the hiring of the watchman, Robin was acting as the agent of Eustis for this purpose. Bragg, one of the partners in the defendant partnership, authorized Robin through its agent Neilson to employ the watchman, and the acts of Neilson were ratified by Eustis in accepting and paying for the services of the watchman.
 

 We do not think it material to whom the money was paid for the rental due on the
 
 *1113
 
 vessel or for
 
 the
 
 services of the watchman, .for in the final analysis Eustis Engineering Company paid these amounts, although the company was billed for both of these
 
 items by
 
 Robin.
 

 In a bare boat charter such as we have found this to be, the charterer of the vessel is bound under admiralty law to return the vessel to the owner in good order at the end of the lease and is liable to the owner for its loss during the charter period if he was at fault. See authorities •cited above.
 

 In the case at bar Rojas established that this obligation to return the vessel had been breached, and that the vessel was lost during the time it was under charter to Eustis, thus making out a prima facie •case of negligence on the part of Eustis. The burden of explaining the loss of the vessel Miss Wendy then shifted to Eustis, and in the absence of exculpatory evidence a presumption of negligence arose .against the defendant partnership. See The Moran No. 10, D.C.N.Y.1924, 41 F.2d 255. Robin as the agent of Eustis provided the watchman for the barges and the boat. Although Robin knew that the watchman had quit, he made no effort to provide .another for the night July 19-20, the night when Miss 'Wendy disappeared. Under these circumstances can Eustis now be heard to say that it was not at fault? We think not, and conclude that defendant Eustis has not discharged the burden of explaining the loss of the vessel by exculpatory evidence.
 

 The fact that Rojas also knew that the watchman had quit did not place any duty on him to remain as a watchman. He had already been relieved of this duty, and the fact that he did not remain on the job in no'way freed Eustis of its duty to care for the vessel, which was in its custody and under its control on a 24-hour basis, and to return the boat at the expiration of the charter period.
 

 The trial judge in awarding damages in this case allowed Rojas $8,000 as the value of the lost boat. There is no evidence in the record to support this award. Evidently the trial judge állowed it 'on a showing made by plaintiff'that he had purchased the boat approximately two years before its loss for $8,000.
 

 In allowing this amount the trial judge erred, for, as said by the United States Supreme Court in Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 467, 69 L.Ed. 890:
 

 “It is fundamental in the law of damages that the injured party is entitled to compensation for the loss sustained. * * * In' case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. * * * Where there is no market value, such as is established by contempo
 
 *1115
 
 raneous sales' of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted . to. The value of the vessel lost properly may be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of the collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy.”
 

 The trial judge also allowed plaintiff $5,700 for deprivation of the use .of, and income-from, the boat. We do not know how he arrived at this amount, for there is likewise no evidence in the record to support this award. In admiralty law;, when the contract for the lease of a vessel is a demise or bare boat charter, rent is payable until the end of the stipulated term if the rented vessel is destroyed through the fault of the charterer. See Robinson, op. cit. supra, pp. 598-599; see also United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403. In the instant case the boat was chartered for a period of two or three weeks, or until the completion of the job undertaken by Eustis in the Mississippi River, and therefore plaintiff is entitled to recover the daily rental until the expiration of the charter period.
 

 Accordingly we will remand the case to the lower court so that plaintiff may prove his damages for the loss of the vessel under the rule quoted from the case of Standard Oil Co. v. Southern Pacific Co., supra, and also establish the period of time remaining in the charter period and the rent due for that period.
 

 The judgment of the district court is reversed and set aside. It is ordered that there be judgment in favor of William N. Rojas against Eustis Engineering Company, J. Bres Eustis, and Charles Bragg jointly, severally, and in solido. It is further ordered that the case be remanded to the district court so that plaintiff may prove the quantum of damages in accordance with the views which we have expressed. Eustis Engineering Company is to pay all costs.
 

 [1]
 

 . No. 42,613 on our docket Is Robin’s appeal, and No. 42,614 is Rojas’.
 

 [2]
 

 . Formerly “tlie right of a common-law remedy where the common-law is competent to give it”.