HOOD, Judge.
This is an admiralty action in which plaintiffs seek to recover damages for the loss of marine equipment and several hundred barrels of liquid drilling mud. This loss was sustained when a barge, loaded with a cargo of liquid mud, capsized while being pushed by defendant’s tug, causing some of the mud and several items of marine equipment to be spilled into the water and lost. The suit was instituted by the lessee of the barge, Intracoastal Liquid Mud, Inc., and the owner of the cargo, Consolidated Gas Supply Corporation, against the owner of the tugboat, Avery O. Choate, d/b/a Choate Towing Company, and his insurer, The National Surety Corporation — Firemen’s Fund American Insurance Company. Judgment was rendered by the trial court in favor of plaintiffs, and defendants have appealed.
Plaintiffs contend that the sole cause of the accident was the negligence of the operator of the tugboat in towing the barge at an excessive rate of speed and in failing to exercise the care and skill of a prudent navigator. Defendants contend that the sole cause of the accident was plaintiff Intracoastal’s negligence in maintaining an unseaworthy barge and in failing to load that vessel properly.
The accident occurred on November 22, 1965, in a canal or waterway known as “Four Mile Cut,” in Vermilion Parish. The barge which was involved in that accident was loaded with a. cargo of liquid drilling mud, and it was being pushed through and along this waterway by a tugboat owned by defendant Choate. While being pushed or towed in that manner, the barge suddenly tilted to its port side, or to the left, and the tug ran upon the left rear quarter of it. The barge then capsized, or at least partially capsized, spilling 811 barrels of drilling mud into the water, and causing a stainless steel hopper and two lengths of hose with fittings to be lost. The tug was then cut loose and backed off, and thereafter the barge righted itself in the water. The part of the cargo which did not spill into the canal was saved.
The barge was made of steel. It was a deck cargo barge, and was equipped especially to carry liquid drilling mud. Four vertical cylindrical tanks, each six feet high and 22 feet in diameter, were welded to the deck of the barge, and the mud was kept in these tanks while it was being transported. On the barge also were some items of marine equipment, including pipes, pumping equipment, several lengths of hose and some metal hoppers, all of which were used to handle the mud. The tanks and this marine equipment were owned by plaintiff Intracoastal. The barge had been leased to and had been in constant use by Intracoastal since 1961. For a period of at least four years prior to the accident it had been used by that plaintiff to haul an average of ten loads of liquid mud per month. It had capsized on only one prior occasion, and that was when it was forced into the bank by a tug operator.
Intracoastal is engaged in the business of selling liquid drilling mud. Shortly before this accident occurred it sold several hundred barrels of that mud to Consolidated, a plaintiff in this suit. After the sale was completed Intracoastal proceeded to load the mud which had been sold into its leased barge so that it could be delivered to the place designated by the purchaser. A representative of Intracoastal arranged with Choate to have the latter’s tugboat tow or push the barge to its destination. Pursuant to that towing agreement the defendant's tugboat proceeded to tow or push the barge from Intracoastal’s dock to the Milwhite Mud Company dock, where some chemicals were added to the mud, and then to the nearby Shell-Morgan Landing, where some tanks on the barge were filled with diesel fuel. Upon leaving the last mentioned landing, the tug and barge then proceeded toward the drilling rig located several miles away where the mud was to be delivered. In order to make that trip it was necessary for the vessels to go through the canal or waterway known as Four Mile Cut, and *645 the flotilla traveled a distance of about three and three-quarters miles along that canal without a mishap before the accident occurred.
At the time the accident occurred defendant’s tugboat was being operated by a crew of two, both of whom were employees of Choate. One of them was Wilson Joseph Hollier, the captain, and the other was Wilson Joseph Newman. No one else was on the tugboat or on the barge as these vessels proceeded through Four Mile Cut.
The tanks on the barge were fully loaded with drilling mud. When loaded in that manner, the barge drew about six feet of water, leaving approximately one foot of free board above the water. A little more weight was put in the rear of the barge than in the front, in order that the bow would be slightly raised as it was pushed through the water. There is a conflict in the evidence as to whether the barge listed a few inches to the left after it was loaded, defendants contending that it did while plaintiffs claim that it did not. For reasons which will be assigned more fully later we find it unnecessary to resolve that dispute.
The canal was unusually shallow at that time because of a northwest wind. A drilling rig had been towed through Four Mile Cut a few days before the accident occurred, and Hollier acknowledged that he was aware of the fact that this had occurred. He stated that when a drilling rig is pulled through a canal such as this it frequently pulls dirt from the banks and causes “mud lumps” to form in the canal. These mud lumps ordinarily cannot be detected by the pilot of a vessel in the canal, but if a barge strikes such a mud lump this blow frequently causes the barge to capsize, unless the barge is being towed at a slow rate of speed.
The. evidence is conflicting as to the speed at which the flotilla was traveling at the time the accident occurred. Captain Hollier testified that the barge was listing two or three inches to its left when he first began towing it. He stated that he began traveling at cruising speed when he reached the Four Mile Cut, but he discovered immediately that an increased speed caused the barge to list more to its left and it caused water to wash over the rear deck of that vessel. He said that he then reduced his speed to three or four miles per hour in order to prevent the barge from listing too much and to prevent water from washing over the rear deck. He testified that he was traveling at that speed, three or four miles per hour, at the time the accident occurred, and that water was not washing over the deck of the barge when it capsized.
Newman, the deck hand who was with Hollier on the tug, testified that the barge was “listing a little bit” when they first began towing it, but that it looked to him like all of the other mud barges they had towed, and no one said anything about it listing. He stated that water began flowing over the rear deck of the barge as soon as they reached Four Mile Cut, that it continued to run “over the back of the barge” the entire time they were in that waterway, and that it was still washing over the deck when the accident occurred.
Corwin Broussard, the employee of In-tracoastal who supervised the loading of the barge, testified that that vessel was on an even keel and was not listing when it left the Intracoastal and Milwhite docks and the Shell-Morgan Landing. He stated that each tank was measured after it was filled, and that the mud was distributed evenly. He said he has supervised the loading of liquid mud on barges many times over a period of years, and that this barge was loaded just as all others are loaded.
Two expert marine surveyors testified at the trial. One of them, Antonius Duval, felt that mud barges with vertical cylindrical tanks, such as were on the barge involved here, are less stable than are at least two other types of mud barges, and that they tend to capsize more easily than others when they strike a submerged object *646 in the water. He concedes, however, that there was nothing wrong with the way the barge was constructed, and that this type of barge is generally used in the industry for hauling liquid drilling mud. The other marine surveyor, Sheldon V. Cass, was of the opinion that this barge was seaworthy and had “positive stability.” He testified that “it was perfectly all right,” and that its seaworthiness or stability would not be affected at all by a two or three inch list to either side. He stated, in fact, that “a slight list like two or three inches, you hardly — you can hardly see it.”
An inspection of the area apparently was not made after the accident occurred to determine whether the barge actually struck a mud lump, so there is no direct evidence as to that issue. The evidence does establish, however, that the tug ran a substantial distance upon the rear deck of the barge, and that this alone could have caused the barge to capsize, whether it did or did not strike a submerged object. The evidence also shows that the front end of a barge tends to rise and the rear end tends to sink lower in the water as it is being pushed by a tug. In this case, Captain Hollier discovered early in his trip that if he attempted to push this barge at cruising speed, its rear deck would sink below the surface of the water. When the rear deck of the barge is that low in the water while it is being pushed, there is a danger that the tug will run upon the deck and cause the barge to capsize.
Since this suit involves a towage contract and the accident occurred in navigable waters, the substantive rights of the parties are governed by the general maritime law. Rojas v. Robin, 230 La. 1096, 90 So.2d 58, 65 A.L.R.2d 1218 (1956); Beavers v. Butler, 188 So.2d 725 (La.App.2d Cir. 1966); Board of Commissioners of Port of New Orleans v. Gypsum Transportation, Limited, 209 So.2d 296 (La.App.4th Cir. 1968).
In a towage contract the owner of the barge is responsible for the seaworthiness of his vessel, and the owner of the tug or towing vessel is responsible for its safe navigation. The owner of the tug is not an insurer of his tow, but he is obliged to perform his work in a reasonable and prudent manner, using such care and skill as prudent navigators usually employ in similar situations. Derby Company v. A. L. Mechling Barge Lines, Inc., 258 F.Supp. 206 (E.D.La.1966).
In Humble Oil & Refining Company v. Tug Crochet, 288 F.Supp. 147 (E.D.La. 1968), the court appropriately stated:
“[1] The Tug Crochet was not a common carrier; nor was it the bailee of the towed barge; nor was it an insurer of the barge’s safety.
“[2] However, the towing vessel and her operators, especially in this instance where the barge was unmanned, were solely responsible for the safe navigation of the flotilla; were obliged to exercise reasonable care and skill as prudent navigators; and were charged with the responsibility for knowledge of the conditions of navigation, including knowledge of channels, depth of water, obstructions, shoals and other dangers known generally to men experienced in navigation.”
If a loss occurs during the towage, the owner of the tow or of its cargo, in order to recover from the towing vessel, must carry the burden of proving by a preponderance of the evidence negligence on the part of the towing vessel. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); Ohio River Company v. M/V Irene Chotin, 238 F.Supp. 114 (E.D.La.1965).
As a general rule, the owner of the barge is held to be at fault when that vessel is unseaworthy, and the towing vessel is not liable for the loss occasioned by the unseaworthiness of the tow, unless its unseaworthiness is disclosed or is so apparent that it would constitute negligence for the tug to attempt to proceed. Ohio *647 River Company v. M/V Irene Chotin, supra; Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496 (C.A.2d Cir. 1961); Curtis Bay Towing Co. of Virginia v. Southern Lighterage Corp., 200 F.2d 33 (C.A.4th Cir. 1952).
In the instant suit the trial judge concluded that the accident was caused by the negligence of the captain of defendant’s tugboat in failing to exercise the care and skill required and expected of a prudent navigator. He also concluded that the barge was seaworthy, and that plaintiffs were not negligent in failing to load it properly.
As we have already noted, the evidence establishes that the tugboat ran up on the rear deck of the barge, and that that circumstance alone was sufficient to cause the barge to capsize. One ■ plausible explanation as to why this occurred is that the barge struck a mud lump, causing the front of the barge to rise and the rear to sink below the water level, thus allowing the tug to ride up on the deck of the towed vessel. Another explanation is that the excessive speed of the tug caused the barge to list too much to the left or caused its rear deck to sink too low into the water, permitting the tug to climb up on the deck of the barge. Under either of those circumstances, the accident would have been avoided if the tug had been traveling at a slower rate of speed. In our opinion, the evidence does not justify any other reasonable explanation as to the cause of the accident.
Captain Hollier knew that the flotilla would probably encounter mud lumps in Four Mile Cut, and that if it did the barge would probably capsize unless it was being towed at a slow rate of speed. He thus was negligent in operating the tug at a speed which was excessive under those circumstances. He also knew that pushing the barge at a relatively high rate of speed caused its rear deck to sink below the surface of the water and it caused the barge to list more to its left. He thus was aware of the fact that it was dangerous to push the barge at a speed which would cause either of these conditions to occur. It was his duty, as a careful and prudent navigator, to operate the tug at a safe rate of speed so that the danger of capsizing the barge would be minimized or elimi1 nated. He was thoroughly familiar with that particular barge, having towed it on prior occasions.
We find no merit to defendants’ argument that the Intracoastal barge was unseaworthy or that it was improperly loaded. The evidence shows that the barge was well constructed and was seaworthy. Assuming that the barge listed two or three inches to its left, as stated by Captain Hollier, the evidence shows that such a minor listing is insignificant and that it was not a proximate or contributing cause of the accident. The evidence does not show that the barge capsized because of unseaworthiness or because it was improperly loaded. We agree with both of the marine surveyors that some external force, such as the tug running up on its rear deck, had to be applied to cause the barge to capsize.
Defendants, however, cannot avoid liability here even if it should be determined that the barge had an excessive and dangerous list, because such a condition would have been apparent to the operator of the towing vessel. All witnesses agree that if the captain of the towing vessel felt that it would be dangerous to tow the barge because of an excessive list, he had the right to refuse to tow it or to require that it be loaded properly. Although Captain Hollier acknowledges that he knew exactly how much the barge was listing, he did not refuse to tow it and he did not require that the cargo be rearranged. In fact, neither Captain Hollier nor anyone else mentioned the fact that the barge was listing. The condition of the barge obviously was not considered to be dangerous by Captain Hollier, because he stated that he was able to tow it safely in spite of the *648 list by merely reducing his speed. Since the operator of the tug was fully aware of the condition of the barge and was able to tow it safely by exercising the care and skill of a prudent navigator, it follows that the fact that the barge may have been listing to one side or another was not a proximate or contributing cause of the accident.
Our conclusion is that the trial judge has correctly disposed of the issues presented in this case. The parties have stipulated as to the amount of the loss which was sustained, and thus no issue has been raised as to quantum. We have not considered the question of whether the doctrine of res ipsa loquitur may be applied here, because it is unnecessary to rely on that doctrine for a disposition of the case.
For the reasons herein assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to defendants-appellants.
Affirmed.